## Commonwealth *v.* Letherman, Appellant.

Argued October 15, 1935. Before FRAZER, C. J., KEP-
HART, SCHAFFER, MAXEY, DREW, LINN and BARNES, JJ.

David M. McCloskey and Vincent R. Smith, with them G. H. Frich, for appellant.

C. Ward Eicher, with him Richard D. Laird, District Attorney, C. D. Copeland, Jr. and John W. Steen, for appellee.

OPINION BY MR. JUSTICE MAXEY, November 25, 1935:

The defendant was convicted of the crime of voluntary manslaughter and sentenced to the Allegheny County Workhouse for not less than two and one-half years nor more than five years. The indictment charged him with the murder of Viola Dennis on August 18, 1934, in the County of Westmoreland. At the time of the homicide charged the victim was twenty-three years of age and the defendant twenty-five. They had been "keeping company" with each other for four years. On August 17, 1934, they met each other by appointment and drove in a motor car from Donora towards Charleroi. The defendant had purchased a round bottle of whiskey and had it with him. Both, while in the car, took four drinks of whiskey and also stopped at a roadhouse and there each had three large drinks of beer. After driving for several hours they decided to go to a roadhouse in Westmoreland County known as "Sweeneys." Shortly before midnight they parked the car in the yard of Fells Church, two miles from "Sweeneys." The car stood on

a spot about four feet above the macadam highway. An hour later the defendant carried Miss Dennis, who was unconscious, into the office of Dr. Ley in Donora. She was taken from there to a hospital, where she died at 6:30 A. M., as a result of shock from skull fracture.

Dr. Ley said of her condition when she was brought in: "Over the left temporal bone there was an abrasion —that is where the fracture was—extending down over the nose. Her lips were cut and swollen, and her eye was congested. She had a cut over the left elbow. The next day I noticed that her breasts were black and blue; likewise, her abdomen and her thighs—different black and blue marks on her legs. She had some black and blue marks on the right side of the body, all over the body in fact; two slight cuts in the back of the head— not deep." The doctor testified that he had asked the defendant what had happened and the latter's reply was that "he was driving out towards Fells Church and a limb of a tree struck their automobile on the highway and broke the glass . . . and threw her up against the car." The doctor said, "I could tell immediately she had a fractured skull," and defendant "said that caused the fractured skull. I [the doctor] said, 'Was she thrown out of the car?' He said, 'No.' I said, 'Was your car ditched?' He said, 'No.'" The doctor told defendant that he had better call the police and defendant answered: "Don't bother about the police, take care of the girl first." The doctor said, "We had better call her mother." Defendant said, "I had better beat it."

After the girl was taken to the hospital defendant returned to Fells Church, picked up the broken glass and the bottle. He scattered the glass in three different directions and threw the bottle over an embankment. The defendant was subsequently arrested and brought to trial.

At the trial defendant told a different story as to what had happened to the girl. He said he parked the car because the girl wanted to get out. He said he told

her that she shouldn't drink so much and she resented it, that he then said "there will be no more of this whiskey," that he took the bottle and threw it with force through what he thought was an open window but "the window happened to be up so the glass crashed," and that he had cut his fingers. He said that the girl "started to wail" and remonstrated with him about being so dumb as to throw the bottle through the window of the car. He said that she turned on him and grabbed his hair and pulled him over to her side of the car and that she started to kick him on the legs and thigh. At this point in his testimony he described her as five feet five inches tall and weighing one hundred and ten pounds. He then said she opened the door of the car and got out and started to run down the bank. When he got out he "found her lying face downward on the road." He asked her to get up and she made no answer. She was limp. He picked her up and carried her back to the car.

Doctor Day testified that he examined the body of the decedent after her death and jotted down his findings on a sheet of paper. He testified that the frontal bone had a fracture extending for about two and a half inches, and that the skin of this fracture was not broken but depressed. He also found a fracture of the nasal bone, bruises on the left ear, and the left eye completely shut. He said, "there were cuts of the upper and lower lips . . . On the right forearm there were two bruised marks and on the wrist right close to the hand, the hand was bruised and the nail on the third finger of the right hand was kind of broken back. On the left side of the chest there was a bruise on the breast and three bruises down below . . . On the right knee there was a cut and on the right thigh there was a bruise. On the arches of both feet there were bruises and on the posterior portion of the scalp there were two abrasions, not very deep." He also described many other minor bruises.

It was testified that the cause of the girl's death was the shock incident to the fractured skull. Dr. Ley tes-

tified that when she was brought to his office "her head fell back and I knew her neck was broken because there was no connection between the spinal column and head at all." Dr. Day, who conducted the post-mortem, testified that he couldn't tell whether or not the girl had a broken neck because rigor mortis had set in when he examined her.

At a point on the macadam road, near where the defendant had parked his car, at Fells Church, was found an elliptical blood spot from six to eight inches wide. On the terrace leading down to the macadam road there were found three marks of the heel of a woman's shoe. One of these marks was within eighteen inches of the level of the road. The blood spot was about five and a half feet from the last heel mark on the terrace. It was testified that the fatal injury was caused by some blunt instrument applied with great force and that a round bottle could have caused such injury, and that the deceased could not have fallen four or five feet over a terrace on a macadam road and received such an injury. It was also deemed significant that there was no break in the skin over the fracture. It was testified that a fall on the macadam road without any break in the skin, could not have caused the fracture described, and that there were no bruises on the girl's forehead or nose. The inference is that if this girl had fallen as defendant claimed, there would have been such marks on her face. Several physicians called by defendant, in answer to a hypothetical question stated that the blow as described to them could have been received by a fall on the road, though one of these physicians on cross-examination admitted that "it would require a hard blow to produce a fracture of the frontal bone" and "that there would be likely to be some brush burns unless there was some material between the skin and the macadam that would protect it." In rebuttal the Commonwealth called three doctors who answered the same hypothetical question by saying that a round bottle could have caused the frac-

tured skull and a fall on a macadam road without the break of the skin could not have caused the fracture described. The answers of the doctors called by the Commonwealth agree with the testimony of Dr. Ley and Dr. Day who examined the fracture.

One witness testified that "near the center of the blood there were sharp, needle-like points sticking up perhaps one-half or three-quarters of an inch high from the road." The significance of this, as pointed out by the court below, is that if the deceased had fallen as defendant claimed she did, there would probably have been some abrasions of the skin.

The point stressed by appellant in this case is that there was not sufficient competent evidence to support a verdict of voluntary manslaughter. This contention has no merit. The corpus delicti in this case was clearly established, and since the defendant was the only person with the deceased at the time she received the injuries, the only reasonable inference is that he inflicted them. The court below in its opinion aptly said: ". . . The many injuries and the character of the fracture itself, especially taken in connection with the evidence that the defendant went back to the scene of the injury and hid the bottle and pieces of glass from the car door, and that he told Dr. Ley a story about a limb of a tree breaking the car window and injuring the deceased, he also made a goodly number of conflicting statements, sufficiently meet the requirement of proof of circumstantial evidence that it points to the guilt of the defendant and be inconsistent with innocence."

Appellant in his argument attempts to place great weight on the fact that the heel marks made by the young woman as she ran or fell down the embankment corroborates defendant's story as to her flight from the car. The appellant says that "they showed the decedent to have fallen or plunged in the manner described by Letherman." These heel marks, together with defendant's own admissions of a fight in the car, tend to sup-

port the theory that the decedent was trying to escape from him, that he followed her and struck her a vicious blow with the bottle, over the head, about at the point where the pool of blood was found.

We think the evidence in this case stamps the defendant's story as to how the deceased came by her injuries as utterly incredible. The court below had no alternative but to refuse his request for binding instructions.

Complaint is made by appellant that the court permitted the Commonwealth to send out to the jury the colored drawing of decedent's body showing the location of the wounds. There is no legal basis for this complaint. This chart was used by Dr. Day, the Commonwealth's witness, as an aid to the jury in understanding his descriptions of the location of the wounds. Charts such as this are of great assistance in clarifying testimony. This chart was made by the witness from notes taken upon an examination of the body a few hours after the death of the decedent. The witness found over thirty marks on the body. The propriety of sending this properly authenticated chart out to the jury is so obvious that it requires no authority in support of it. Such charts are used in other jurisdictions as indicated by the cases of Hankins v. State, 145 S. W. 524, and Combs v. State, 260 S. W. 736.

Another assignment of error is based on the following excerpt from the charge of the court: "Now that is embodied in this bill of indictment—murder of the first degree and murder of the second degree, and then there is another charge laid at the door of this defendant, and that is manslaughter, voluntary manslaughter." Appellant contends that a charge of manslaughter is not included in an indictment for murder. This contention has nothing to support it in the law of Pennsylvania. From the earliest days of this Commonwealth convictions of manslaughter have been sustained on indictments for murder. In Com. v. Gable, 7 S. & R. 422, Mr. Chief Justice TILGHMAN said: "Manslaughter is in-

cluded in murder." It has been the uniform practice of the courts of this Commonwealth at all times to permit convictions of voluntary manslaughter on such indictments. In murder there is not only an unlawful and felonious killing, which is present in voluntary manslaughter, but also the malice aforethought and the specific intent to take life. On this branch of the case appellant quotes the Crimes Act of 1860 and says that section 20, paragraph 28, expressly provides for different language in indictments for manslaughter and in indictments for murder. It is true that this section provides that "it shall be sufficient, in every indictment for murder, to charge that the defendant did feloniously, wilfully and of his malice aforethought, *kill and murder* [italics by appellant] the deceased; and it shall be sufficient in every indictment for manslaughter, to charge that the defendant did feloniously *kill and slay* [italics by appellant] the deceased." We do not find any basis for interpreting this section as meaning that you must have a separate indictment or count for voluntary manslaughter in order to sustain a conviction of the latter crime. The section quoted means that if a person is indicted only for voluntary manslaughter, it is sufficient to charge in the indictment that the defendant did feloniously "kill and slay," but since a man cannot be murdered without being killed or slain, it follows that in an indictment for murder a "killing and slaying" is included.

Appellant also complains that the court refused to permit him to prove that "it was the habit of the deceased to drink to excess until she became intoxicated and unmanageable, for the purpose of showing character and disposition of the deceased, and as explaining her conduct on the night of the accident." As the defense was not self-defense this testimony was clearly inadmissible. It would not be admissible even if it was offered to prove self-defense, for the fact that a person becomes "intoxicated and unmanageable" would not justify a

killing even in self-defense. Counsel also stated at the trial that they proposed to call "friends of both parties to prove these same things," and to show that "she frequently attacked him, pulling his hair, scratching him and kicking him." Even that, if proved, would not justify a killing in alleged self-defense. However, it is sufficient to state that no such defense was here alleged.

Complaint is made because the court first admitted what was characterized by appellant as "highly improper and prejudicial testimony" over the objection of defendant. Appellant claims that, though the court later had it stricken from the record and instructed the jury to disregard it, the error was not cured. The testimony referred to was that of one Negleman, who said that between 11:30 and 12:15 o'clock on the night of the occurrence under review, he saw a dark coupé parked near Fells Church and that he overheard a conversation between a man and a woman in the car and saw actions indicating a fight. He gave other testimony indicating a motive for the killing of deceased by defendant. This testimony was later stricken from the record for the reason chiefly that the color of defendant's car was different from the color of the car described by Negleman. The criminal record of this witness also apparently influenced the court in telling the jury to disregard his testimony. As to the assignment of error based on this witness's testimony, the court below said: "The trial judge carefully instructed the jury to disregard this testimony and gave them the reasons why it should not be considered. He further instructed them that Negleman knew nothing about this case. We believe this instruction protected the defendant and even if it did not it was all the trial judge could do in view of the fact that the defendant did not ask for a withdrawal of a juror but elected to proceed with the trial and take chances on a verdict. He cannot now complain: Com. v. Pava, 268 Pa. 520 [112 A. 103]; Com. v. Razmus, 210 Pa. 609 [60 A. 264]. Again, a review of this testimony leaves the

court in banc in no doubt that this testimony was competent and its probative value was for the jury." We agree with the court below as to this. If the testimony had been submitted to the jury for what it was worth, the appellant would have no just cause for complaint.

There are no other assignments of error in this case which require discussion.

The defendant received a fair trial. From the evidence in this case, he is fortunate that he was not convicted of a higher crime than that of voluntary manslaughter.

The judgment is affirmed and the record is remitted to the court so that the sentence imposed may be carried out.