Frank MARRONE, Appellant,

v.

STATE of Alaska, Appellee.

No. 5.

Supreme Court of Alaska.

Feb. 15, 1961.

Wendell P. Kay, Anchorage, for appellant.

George N. Hayes and Dorothy Awes Haaland, Anchorage, for appellee.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

AREND, Justice.

Frank Marrone, the defendant below, was by indictment filed in the District Court for the District (Territory) of Alaska, Third Division, on the 7th day of November, 1959, charged with murder in the first degree. He was tried by jury, convicted of the included offense of murder in the second degree, and sentenced to a term of twenty years, from which judgment and sentence of the District Court he appeals.[1]

As his first specification of error, the defendant claims that the Territorial District Court had no jurisdiction or power to try him for a state offense after the admission of Alaska to Statehood.[2] This Court in a very recent opinion rendered in the case of Hobbs v. State of Alaska, Alaska 1961, 359 P.2d 956, has held that the District Court for the District (Territory) of Alaska was properly established by Congress as an interim court after statehood and, so continued, was accepted and adopted by the people of Alaska by express provision contained in the State Constitution until the state courts should be organized. In line with that decision and the reasoning therein set forth, we here hold that the District Court for the District of Alaska had full jurisdiction to try the defendant for the offense charged against him.

There are eleven additional assignments of error. These will be considered in substantially the same order in which they are set forth in the appellant's brief. First we shall relate the essential facts of the case as gleaned from a rather lengthy record. We commence with the account given by witnesses for the prosecution.

Don Iannitti, proprietor of the Pink Garter night club located on the Seward Highway and just outside the city limits of Anchorage, Alaska, was shot to death behind the bar of his establishment at about 6:15 o'clock on Friday evening, July 18, 1958. Two bullets fired from a .357 Magnum revolver had entered his body, one in the back and the other, on bodily contact from the weapon, in the stomach. Either shot would have floored the victim and killed him within minutes. The weapon had been kept on premises by the decedent and was found near his body.

At about 3:00 o'clock, P.M., of the fatal day, the defendant and the victim were engaged in a friendly game of "flipping" silver dollars at the Last Chance night club where the defendant was employed as a bartender. Their bets ran from $20 to $100 "per flip". Iannitti had won about $300, when the talk turned to betting on a pending prize fight. The defendant offered odds of $800 to $500 on the favorite, and then wanted to "sweeten the pot" to a bet of $1,600 to $1000. Iannitti would not bet until he saw some money; so, at about 3:30 o'clock, the defendant went to his bank and made a withdrawal of $2,500 from his savings account. In the meantime, Iannitti, who was flashing a roll of about $2,000 or $3,000, also left the Last Chance for the tax office where he paid some taxes by check in the sum of $500.

The defendant returned to the Last Chance in about thirty minutes; while Iannitti did not get back until about 4:30 or 5:00 o'clock that afternoon. Talk about

1. This Court has jurisdiction of the appeal by virtue of Section 16 of the Alaska Statehood Act, Public Law 85–508, 72 Stat. 350, approved July 7, 1958, 48 U.S. C.A. preceding section 21, and Section 52A–1–32, Alaska Compiled Laws Annotated 1949, Cum.Supp.

2. The Territory of Alaska became a state on January 3, 1959, by proclamation of the President of the United States, No. 3269, 48 U.S.C.A. note preceding section 21, pursuant to Public Law 85–508, 85th Congress (72 Stat. 339). The defendant's trial took place during the last days of April, 1959, and judgment was filed on May 1, 1959.

the fight bet was resumed, but Iannitti was disinclined to make a bet at that time and insisted that defendant go with him to the Pink Garter as he, Iannitti, had some work to do there. The two men left the Last Chance together shortly after 5:00 o'clock. The victim had been doing considerable drinking up to this point and was described as being "high" but not drunk.

At about 5:45 o'clock the victim called his wife Helen to report that he was at the Pink Garter and would be "coming home in a few minutes." Helen could detect that he was drinking. She waited about ten minutes and then called him back. He told her that he was at the Pink Garter alone with the defendant. After that the victim's daughter also talked with Iannitti on the phone from home and he told her that he would be right home. Then Helen called a cab and set out for the Pink Garter, taking with her the three children of the family. Just before leaving home she called the Pink Garter once more and heard a man say: "Hello, hello, who's there?" Without answering, she hung up.

At the preliminary hearing Helen had testified that she recognized the voice as that of the defendant; but at the trial she stated that after the preliminary hearing she made some test phone calls to the defendant and decided it was not the defendant who had answered her last call on the evening of July 18. She reasoned to the jury that the voice she heard on the 18th sounded like the low, even tone of the defendant as she had heard it in San Francisco several years before; but, with respect to the voice of the defendant she had listened to on her test calls, she stated that defendant's "voice is too childish now; he talked high."

At thirteen minutes after six o'clock, Helen and the children entered a Yellow Cab at their home and arrived at the Pink Garter at about 6:19 o'clock, according to the cab driver. Helen estimated the arrival time at the Pink Garter to have been half past six. En route, as they paused at a four-way stop street intersection about two and a half blocks from the Pink Gar-

ter, Helen recognized the defendant sitting in the front seat of another taxicab coming from the direction of the Pink Garter towards the city of Anchorage, although she admitted that he "looks like a lot of people." This other cab was also momentarily stopped at the intersection.

It was quite dark inside the Pink Garter when Helen and the children entered. She called to her husband and, when he did not answer, she picked up a flashlight lying on the customer bar, and searched the building. It was her seven-year old son who first discovered the victim's body on the floor inside the bar in a "sort of sitting or slumped position." The body was still warm when Helen touched it, but she could not feel a pulse or heart beat. The gun lay on the floor nearby. She reached for the phone to call an ambulance, but the phone was dead—shot away in pieces. Her screams brought in the cab driver who was still waiting outside. He put in a call for the police at about 6:29 o'clock. They arrived at 6:34 or 6:35. The police found no one at the Pink Garter other than Helen, the children and the driver of the Yellow Cab; nor had Helen seen anyone else there on her arrival. Approximately $50 was found on the victim's body.

On the evening in question the operator of a tool rental business, located on the Seward Highway and about 230 feet north of, or towards Anchorage from, the Pink Garter, saw a man of medium build, wearing a short-sleeved sport shirt, without a coat, whom he identified as the defendant. The man was walking fast, almost running, on the opposite side of the road towards Anchorage. Also he was looking around as if he wanted to catch a ride. The weather was misty and cool, and the time was between 6:15 and 6:30 o'clock. Right after that, a two-tone, dark and light, colored taxicab went by towards town. "It slowed down."

Lyle Warming, an Anchorage cab owner and operator, testified that on the evening of July 18, 1958, at about 6:00 o'clock he took a lady passenger from Anchorage to the Ace-in-the-Hole, a bar and club,

situated about 3 and ½ or 4 miles south on the Seward Highway. He was driving a black cab with a white top. On the drive back to Anchorage he pulled off the Seward Highway just beyond the Pink Garter and the tool rental shop and picked up the defendant, who was walking along the highway and had hailed the cab. The defendant asked to be taken to the Fort Starns, but he got out shortly before Fort Starns. The pickup was after six o'clock. Lyle's wife, who worked with him in the cab business, established by the dispatch log that the defendant was picked up by her husband at 6:23.

The defendant was not seen again by any witness for the Government until about 8:00 o'clock that evening when he brought his wife Kitty to her job as a hostess at the Last Chance. He appeared nervous and told about leaving Iannitti at the Pink Garter gambling or talking with a third person. No mention was made of Iannitti's death. At about 9:15 or 9:30 o'clock, the defendant appeared at the Guys and Dolls night club and gave the bartender $2,950 in cash for safekeeping. He had two or three drinks and talked about "this incident that happened in the afternoon." He stated that he was going to talk to the police as they would probably be looking for him because he had been with Iannitti during the day. He also told about the fight bet discussed between him and the decedent at the Last Chance; how he, the defendant, withdrew $2,500 from his savings to place on the fight bet which did not materialize; and how he left Iannitti in a gambling game because he figured Iannitti had "called in somebody to put him (the defendant) in the middle." He told the bartender that he could use the money to get the defendant a lawyer, if he needed one.

At about 8:50 o'clock that evening the police went to the Last Chance club, where they spoke with the owner of the club, the bartender who later received the $2,950 from the defendant, and Kitty Marrone the defendant's wife. Two of the officers, Chellis and Goodfellow, then went with Kitty to inspect the Marrone apartment,

about three or four blocks distant. She told the officers of conversations she had had with the defendant that evening. They left the apartment at about 5 minutes before 11:00 o'clock and met the defendant outside as they were leaving to drive Kitty back to the Last Chance. Kitty gave the officers a written statement a day or two later.

The defendant accompanied Officer Chellis to the police station directly across the street from the apartment. There the defendant, after being apprised of his rights, related his dealings with the decedent that day very much as above outlined up until the time that he and the defendant went to the Pink Garter and resumed their "flipping" game. According to the defendant he won about $800 from the victim, including the $300 he had previously lost. Some time after the defendant had gone to the men's room for a minute or two and returned, a stranger named Joe entered the Pink Garter, ordered a beer, flashed a big roll of bills, and got into the game. The defendant became suspicious that, while he was in the men's room, Iannitti had called up Joe and got him into the game to "gang up" on him, Marrone. So the defendant gave the excuse that he had to go home to pick up Kitty and left about 5:30. At that time Iannitti had won about $1,000 from Joe. The defendant walked along the highway towards town and hailed a cab at the service station. He got out of the cab at Gamble Street and Fifth Avenue (Seward Highway), where he crossed the street to a drugstore to find a Ring Magazine. He did not find the magazine so he proceeded to walk east on Fifth Avenue, four blocks to his residence at the Chinook Motel, in the vicinity of Fort Starns. Kitty was getting ready to go to work; so he accompanied her to the Fort Starns Cafe where they had something to eat and then he took her to work. The time was not fixed.

Marrone stated to Officer Chellis that he called Kitty from a downtown bar about 8:30 o'clock and learned from her employer, who answered the phone, that Iannitti

had been shot and killed. This was news to the defendant. Chellis informed Marrone that he was a suspect, and the officer then went with him, for further questioning, to the Criminal Investigation Section of the Army at nearby Fort Richardson, where they arrived at about 2:05 A.M. on July 19. The defendant appeared calm up to this time.

At Fort Richardson the defendant told the criminal investigator for the Army, whose services were available to the civilian police departments of Alaska, much the same story in narrative form that he had told to Officer Chellis. However, he made no mention of any firearms and, when questioned on the subject, at first denied that he had used a weapon or shot anyone within 72 hours last past. The defendant then for the first time appeared apprehensive and became extremely nervous. The investigator explained to him the use of the paraffin test for indicating whether a person had fired a gun and asked him again whether he had fired a gun. The defendant then told about firing Iannitti's weapon at a paper napkin, upon decedent's insistence, and about missing the paper and hitting a bottle instead. He asked what the penalties were in Alaska for shooting a man and then stated that he desired legal counsel and wanted to terminate the interview. He made a comment to the effect that he should not have said anything about firing the weapon. It should be noted that he told the investigator that he took his wife to work at the Last Chance at about 7:30 P.M.

The defendant took the stand in his own behalf and retold his story with some additional details. He gave his age as 31 and stated that he ran away from his home in Brooklyn when he was 15; that he spent 7 months in the Army in 1945 and received an Honorable Minority Discharge. In 1955 he was paroled from the penitentiary .in California after serving 37 months of a five-years-to-life sentence on a combined charge of two robberies, one escape and one forgery of checks. He first knew Iannitti outside the liquor bars in Los Angeles around 1945 and had a business deal with him in San Francisco in 1957. Soon thereafter he and his wife Kitty came to Alaska to seek employment. Five days after his arrival he met Iannitti at the Fort Starns. He held jobs successively as a bartender or waiter at the Guys and Dolls, the Open House, and the Last Chance. On July 18, 1958, he was working the 7:00 A.M. to 3:00 P.M. shift as bartender at the Last Chance. Iannitti came into the establishment at about 11:00 A.M. and started gambling with the defendant for drinks and soon they were "flipping" for money. This had been preceded by some Indian wrestling. The defendant first won about $200, but then he gave Iannitti a chance to get his money back, because he, Marrone, "knew" that he was going to win on a prize fight bet with Iannitti anyhow. By 3:00 P.M. he was ahead $300 in the "flipping" game. Iannitti offered Marrone a job at the Pink Garter and insisted on taking him over there to show him the place.

The defendant surmised that he and Iannitti arrived at the Pink Garter at about 4:30 or 4:40 P.M. He had no idea from where Iannitti produced the gun that was fired at the napkin, or what Iannitti did with it afterwards. Iannitti did not fire the gun. About 5 or 10 minutes after arriving at the Pink Garter, he began "flipping" again with Iannitti. He remained in the game about 40 or 45 minutes, and then after another 3, 4 or 5 minutes, or even 10 minutes, he left for home. Some of the "flipping" took place on the cement just outside the front door, but defendant "might have got a little chilly" because he "only had a short sleeve shirt on", so they finished the flipping inside.

With respect to the stranger who entered the game, the defendant stated that he "described himself as Joe," and had on a sport shirt and sport coat, was about 5 feet 11 inches tall, had "sort of blondish hair, with light eyes" and weighed about 175 or 180 pounds. Defendant flipped 2 or 3 times with Iannitti and Joe, each using a coin in the matching game. The flips were for $100, and Iannitti won every time.

The defendant was not drunk but "feeling good." After defendant quit the game, he stayed long enough to watch Joe win about $900 in somewhere between 18 and 35 flips—"it goes real quick". Just before he left the Pink Garter, defendant asked Iannitti for the use of the latter's car as he had no car of his own and had on only a short sleeve shirt. Iannitti refused and told the defendant to walk home as it wasn't far.

Marrone testified that, on leaving the Pink Garter, he crossed the highway and started walking towards Anchorage. Observing that he might be a mile or two from his home, he hailed a cab and got into the front seat. He arrived home at 5:30 or 5:45, and in 5 or 10 minutes left with his wife to dine at the Fort Starns Cafe, arriving there at about 10 or 15 minutes to 6:00 o'clock, as the dinner rush had not yet started. He always ate there between 5:15 and 5:30. The defendant and his wife stayed at the cafe "a good hour—till around five to seven, 7:15;" then after a quick dash home they arrived at the Last Chance between 7:30 and 7:40.

On cross-examination, the defendant admitted that he had not told Officer Chellis about firing a gun at the Pink Garter; but he insisted that he never denied firing the gun when questioned by the Army investigator. In his own words: "I didn't really say 'no, no,' I just shook my head. 'It is a tough question you are asking me', I said * * * It was just a matter of a second and then I went ahead and told him, 'I fired a gun.'" He also admitted that, when asked by the investigator whether Iannitti had ever made a play for Kitty, he told the investigator that Kitty was not the only wife Iannitti spent money on and that he, Marrone, did not care because "that was part of the business." He explained that, although he was within 100 feet of the police station, he did not report his story to the police sooner because he knew that the police were going to come see him. "If they want to look for Joe, let him go look for Joe * * * I got my own troubles," he told the jury.

Elsie Savage, called as a witness by the defendant, testified that she had been Lyle Warming's passenger in his taxicab to the Ace-in-the Hole Club as already stated herein. She said that it was she who had looked at her watch on the way to the club and informed Lyle that it was 6:05 P.M. Bert Higgins, the proprietor of the Ace-in-the Hole, paid Elsie's fare and then told her that he "had to get the car home before the bank closed," and he then took off.

Higgins also testified for the defendant and stated that when Elsie Savage, his girl friend, arrived in the cab at his club he was changing a flat tire on his automobile. He looked at the clock in the club and realized he had to get to the bank before it closed at 6:00 P.M. to get cash and change for the weekend. He arrived at the bank in time. He made no deposits at the bank; there is no record at the bank of his visit there. On cross-examination Bert stated that he had lived with Elsie but not as husband and wife; that he was a friend of the defendant in a casual way; that he had given no thought to the time and bank incidents above-mentioned until two weeks prior to the trial[3] when he was contacted by defendant's attorney, although he admitted that Officer Chellis had asked him on July 28 if he knew anything about the matter when the officer was interviewing Elsie about her July 18 taxicab ride. He admitted that he had been convicted in Philadelphia of breaking and entering about 20 years before.

Dan Anaruma, a bartender and casual friend of the defendant, testified that on July 18, 1958, he went to eat at the Fort Starns at "almost 6:00 o'clock." The Marrones were there eating at a booth and were still there when the witness left at about 7:00 o'clock. The next day he learned that defendant had been arrested for the shooting of Iannitti but he did not tell the police of seeing the Marrones at

3. The trial was commenced on April 22, 1959.

the time Iannitti was shot, because he contacted the defendant's bondsmen first, who took him to see the defendant's attorney. The attorney told him not to discuss the matter or say anything to anyone about it. Anaruma enumerated four convictions in his record—for petit larceny, drunk driving, and twice for disorderly conduct.

Bennie Pugh, waitress at the Fort Starns Cafe, called by the defendant, testified that the Marrones arrived at the cafe for dinner on July 18, between 5:30 and 5:45 P.M., just before the 6:00 o'clock counter rush. They were regular customers there and she served them "just about the same time everyday." The next afternoon, when she heard of the shooting for the first time and that Frank was being held therefor, she made the statement "Well Frank couldn't. I was feeding him and his wife in here at the time."

There was testimony that the victim, when drinking, frequently brought out the subject weapon and fired it at targets in the Pink Garter, on occasion inviting others to try their marksmanship with him. The weapon, two beer cans and some whiskey glasses, used at the Pink Garter on the day of Iannitti's death, were sent to the laboratories of the Federal Bureau of Investigation but that agency could find no identifiable fingerprints on the items submitted. The Pink Garter, the Last Chance, and most of the other night clubs mentioned in the testimony in this case were described as "B Girl establishments" or "B Girl Joints" in which "hostesses" entertain and chat with the customers and solicit the men to purchase champagne.

The record and briefs of the parties disclose that the trial of this case was transferred to Juneau, Alaska, on motion of the defendant for a change of venue because of certain newspaper publicity at Anchorage in April, 1959, allegedly implying that the defendant had caused a witness for the prosecution to be threatened and attacked. Upon voir dire examination by the trial court at Juneau, one of the veniremen, Louis J. Anderson, when asked if he had read anything about the case, indicated that he had read or heard that the case had been shifted to Juneau "because somebody was supposed to have beaten up on a witness or something," and that this had caused him to form an opinion. The questions on this score propounded by the court to the prospective juror and the latter's answers thereto are set forth in the margin below [4].

4. "Q. Have you read anything about this case? A. Well, I heard something about this. I talked to a friend of mine down here a few days ago. I heard some trouble; they shifted the case down here on account of this witness problem or something they had up there.
"Q. Well, does that tend to bias or prejudice you? A. Well, I don't know. All I can say is that it seems as though the reason the case was moved down here is because somebody was supposed to have beaten up on a witness or something.
"Q. Would that fact, if it be a fact, tend to bias or prejudice you in the trial of this case? In other words, that would not be an issue in this case but the fact that you have discussed that, would that tend to bias or prejudice you? A. Well, a person kind of formulates an opinion more or less on it.
"Q. Well, upon what theory could you formulate an opinon? A. Well, there must be something to the case, if he was moved down here, if these guys were beating up on them.
"Q. Well, I point out to you, under the law, counsel have a right to move the Court. A. I understand that.
"Q. And that is a judicial determination. Maybe the Court was in error, but nevertheless, it was granted and we are here to try the case. Now, the fact that counsel has moved to have a change of venue and the Court has seen fit to grant that change of venue, would that tend to bias or prejudice you? A. Well, I couldn't say I could be completely unbiased, no.
"Q. What would cause you to be biased? I don't understand your philosophy. A. I will tell you some more about this case. I have a sister—
"Q. Pardon me. If you feel you have a bias or prejudice so that you couldn't be fair to the government as well as the defendant, then of course, we don't want you to serve. Counsel are entitled to a fair jury, not a favorable jury, but they

The court then suggested to counsel that he would excuse the juror without going into the facts further, if they had no objection. Counsel for the defendant responded, in the presence of the entire venire:

"I am inclined to go along with the Court. I am a little puzzled to know the effect on the remainder of the jury panel. Evidently this juror jumps to the assumption because it is printed in the newspaper, it must be true. I hope nobody else has that idea."

Thereupon the court instructed the entire venire that they were not to give any effect as to the guilt or innocence of the defendant by virtue of the fact that an article had appeared in the newspaper. The venireman Anderson was excused for cause. At this point counsel for the defendant moved the court for a mistrial because of what had occurred in connection with Anderson's examination. The motion was denied and the court again instructed the jurors to disregard the statements made by Anderson.

 As his second specification, the defendant assigns as error the court's refusal to grant the motion for mistrial. He contends that the voir dire examination of Anderson had the effect of informing all of the prospective jurors that a change of venue to Juneau had been granted because of an allegation in Anchorage that the defendant had beaten up on a principal Government witness or caused the witness to be beaten up. We disagree.

It is to be noted that counsel made no objections to the questions as they were being asked by the court nor to the juror's answers; and he did not ask that the other jurors be excused as the examination of Anderson progressed. It appears to us that

counsel was himself interested in learning just what and how much the juror knew about the background for the change of venue to Juneau. He cannot now be heard to complain. Furthermore, with the wide dissemination of news by press and radio today it would be unreasonable to assume that none of the other jurors in the courtroom had read or heard about the change of venue to Juneau and the reasons therefor. Surely it was no usual event for a whole court and the litigants in a case such as this to travel hundreds of miles from one city in Alaska to another to hold trial. The fact that they heard Anderson's statements in the courtroom or may have read in the newspapers or heard from other sources about the attack upon a Government witness in Anchorage would not be determinative of whether they could be fair and impartial jurors in the trial of the defendant. The true test to be applied is whether they had formed a fixed opinion as to the guilt or innocence of the defendant from what they may have read or heard about the case. There is nothing in the record indicating that the jurors who were finally qualified and sworn to try the defendant were anything but fair and impartial, with open minds.

The defendant states in his opening brief that the proper course for the trial court to have taken would have been to grant the motion for a mistrial and change the venue to Fairbanks or some more appropriate location. The record does not show that a motion for such change of venue was ever made but, even if it had been made, it would have been addressed to the sound discretion of the trial court, under Rule 21(a) of the Federal Rules Criminal Procedure, 18 U.S.C.A., which prevailed in Alaska at the time of the trial of this case,[5] and in the absence of abuse of discretion denial of the motion would not have

must not have a jury that is biased or prejudiced one way or another—don't make any difference who it is for * * "

5. The rule provides:
"*For Prejudice in the District or Division.* The court upon motion of the defendant shall transfer the proceeding

as to him to another district or division if the court is satisfied that there exists in the district or division where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that district or division."

been error. Kersten v. United States, 10 Cir., 1947, 161 F.2d 337, certiorari denied, 1947, 331 U.S. 851, 67 S.Ct. 1744, 91 L.Ed. 1859; Shockley v. United States, 9 Cir., 1948, 166 F.2d 704, certiorari denied, 1948, 334 U.S. 850, 68 S.Ct. 1502, 92 L.Ed. 1773; Jones v. State, 1951, 156 Tex.Cr.R. 248, 240 S.W.2d 771. The authorities just cited also hold that publicity about a case is not decisive in determining whether a change of venue should be granted. As pointed out in People v. Brindell, 1921, 194 App. Div. 776, 185 N.Y.S. 533, 536, "If newspaper articles furnished ground for removal, no defendant could ever be tried in this country for a spectacular crime."

In the instant case, the trial judge twice admonished the prospective jurors, on the spot, that they were to disregard any newspaper article or anything said by the juror Anderson as affecting the guilt or innocence of the defendant; and in his written instructions at the conclusion of the trial he reminded those jurors, who had been accepted and sworn to try the case, that they had taken an oath to render a true verdict according to the law and the evidence as given to them at the trial and informed them that their oath meant that they were not to be swayed by passion, sympathy or prejudice and that their verdict should be the result of their careful consideration of all the evidence in the case. We find that the defendant failed to show that any prejudice resulted to him and hold that the court did not abuse its discretion in denying the motion for mistrial.[6]

■ The next assignment of error discussed in the appellant's brief relates to the inadvertent action of the trial court in permitting the jury to take to the jury room and keep with them during their deliberations two written pre-trial statements made to the police by the decedent's wife, Helen Iannitti. These documents were practically identical in content and were marked defendant's exhibits "B" and "C" for identification only. Helen was cross-examined only as to the first sentence of each statement and was asked no questions concerning the balance of the statements, except that she was handed both statements by defendant's counsel and was asked by him to look at them carefully and tell the jury the difference between the two. Later counsel for the Government tried to get the entire statements admitted in evidence, but counsel for the defendant, in the presence of the jury, argued strenuously against their admission. The issue was taken under advisement and was not resolved until the day of sentencing when the court called counsel's attention to the inadvertent mistake of letting the statements go to the jury room and made what amounted to a nunc pro tunc order admitting the statements in evidence in toto.

Under Alaska law it was certainly error not to keep these exhibits away from the jury.[7] However, the error occurred through inadvertence and not through the design of either counsel. The jury was made well aware of defendant's contention that the exhibits were inadmissible by the able argument of his counsel in their presence, as the record discloses. Defendant claims that the statements could only serve to emphasize and give undue weight to the testimony of this important Government witness, Helen Iannitti, especially with reference to the identification of the person who answered the phone at the Pink Garter in response to Mrs. Iannitti's last call and the identification of the defendant in a taxicab a few minutes later.

We have examined both exhibits and fail to find any statement therein to the effect that it was the defendant's voice heard on the telephone. Helen merely stated:

"* * * Another man answered the phone. He said 'Hello, who's there.'

6. See Gicinto v. United States, 8 Cir., 1954, 212 F.2d 8, certiorari denied, 1954, 348 U.S. 884, 75 S.Ct. 125, 99 L.Ed.

695; also cf., State v. Patterson, 1935, 183 Wash. 239, 48 P.2d 193, 196, 197.

7. Sections 55-7-68 and 66-13-51, Seventh, A.C.L.A.1949.

It was not my husband's voice and I just hung up."

This statement was actually more favorable to the defendant than Helen's testimony in court regarding the voice on the telephone.

It is true that in the exhibits Helen's identification of the defendant as the person she saw in the taxicab is quite positive, but no more so than her identification of him in her direct testimony on the witness stand. As to this latter identification she was very thoroughly examined and cross-examined while on the witness stand. In all other respects we find the statements in the exhibits to be very similar to her story at the trial and in many instances buttressed by the testimony of other witnesses. We have nothing before us upon which to base a conclusion that the exhibits influenced the jury and, therefore, hold with some good authorities that there was no error on this point. See Miller v. United States, 9 Cir., 1925, 4 F.2d 384, 5 Alaska Fed. 258, affirming 7 Alaska 252; Posey v. State, 1956, 234 Ind. 696, 131 N.E.2d 145, 54 A.L.R.2d 706; People v. Kirkpatrick, 1953, 413 Ill. 595, 110 N.E.2d 519; State v. Fuller, 1955, 203 Or. 608, 280 P.2d 980. It becomes unnecessary for us to decide whether these exhibits were admissible in evidence under the circumstances in which they were used here.

■ The fourth issue raised in appellant's Brief is based upon specifications No. 2 and No. 3 and is to the effect that the indictment charged no greater offense than manslaughter because the element of "pur-

pose" is omitted; and, therefore, the court erred in instructing the jury as to first and second degree murder.

The Alaska statutes defining the crimes of first and second degree murder require that the killing be done purposely;[8] and the model forms of indictment for murder, suggested in Section 66–9–5, A.C.L.A.1949, use the word "purposely" in describing the killing.[9] Thus it is apparent that the element of purpose must be alleged and proved. It would have left no room for argument here if the prosecutor had simply used the plain word of the statute; but we do not regard his failure to do so as fatal in this case.

The applicable Alaska statutes require only that the indictment contain a statement of the facts constituting the offense in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended; and they provide that it is not necessary in the indictment to strictly pursue the words used in the statute defining the crime, but that other words conveying the same meaning may be used.[10]

The charging words of the indictment under consideration here that the defendant "did, with deliberate and premeditated malice, willfully, unlawfully and feloniously kill one Don Iannitti by shooting said Don Iannitti with a .357 caliber magnum revolver" should leave no doubt in the mind of a person of common understanding that the element of purpose was intended to be, and is, reflected in the words used in the indictment to describe the nature of the killing.[11]

8. Sections 65–4–1 and 65–4–3, A.C.L.A. 1949.

9. This is not so in the case of manslaughter, however. Section 66–9–5, A.C.L.A. 1949.

10. Sections 66–9–3, 66–9–12, 66–9–13, A.C.L.A.1949. The Federal Rules of Criminal Procedure, which were applicable to criminal cases in the District Court for the District of Alaska during all phases of the instant case up to the time of appeal also provide that the indictment need be only a plain, concise and definite statement of all the facts consti-

tuting the offense. Rule 7(c). The suggested form for first degree murder, contained in the appendix to the Federal Rules, omits the word "purposely" entirely and states simply "with premeditation." See Appendix of Forms, form 1, following Fed.R.Crim.P. 60.

11. For case authority in support of our position, we call attention to United States v. Illinois Central Railroad Co., 1938, 303 U.S. 239, 242, 243, 58 S.Ct. 533, 535, 82 L.Ed. 773, in which the Court defined the term "wilful" as meaning "with evil purpose" or "purposely";

Since we find that the element of purpose was sufficiently alleged in the indictment, it follows that the trial court's instructions on both first and second degree murder which included a definition and explanation of the meaning of the element defined as "purpose" were in order.

■ Specification No. 9 charges error on the part of the trial court in restricting the scope of defendant's closing argument and in permitting the prosecutor to make improper and prejudicial remarks in his closing argument.[12] The record discloses that when counsel for the defendant referred to the book "Not Guilty", written by the jurist Jerome Frank and his daughter, and pointed out that it is a collection of thirty-six actual cases in which innocent people were convicted, counsel for the Government promptly objected that the argument was improper. Both counsel approached the bench and after some disputation, the nature and content of which are not set forth in the record, the objection was sustained. Since the book itself was not sent up with the record and it does not appear that it was ever introduced in evidence, we have nothing before us upon which to rule.

Turning our attention next to the charge in specification No. 9 that the court erred in permitting the prosecutor for the Government to make improper and prejudicial remarks in his closing argument, we find that the defendant has detailed in his brief four charges of misconduct, namely: (1) The prosecutor characterized the defendant and his witnesses as "hoodlums" and criminals; (2) He argued that the defendant should have produced his wife as a witness and that the Government could not have produced her; (3) He declared his personal belief in the witnesses for the Government, and his personal opinion that all defense witnesses were lying; and (4) He colored

his final argument with constant reference to "B-Joints", and he concluded with an appeal to the jury to convict the defendant because the eyes of the "hoodlum" element were watching the case. We shall take up these alleged errors in the order just given.

■ 1. Twice in his closing argument, counsel for the Government used the word "hoodlum", the first time near the beginning of his speech as follows:

"Mr. Dewey Dickey, [a Government witness] another one—Guys and Dolls' Manager, a part of the same hoodlum crowd, comes up and he says * * *";

and again near the end of his argument:

"* * * The eyes of the good people of Anchorage are on what you of Juneau, jury, does. More important than that, more important, the eyes of the hoodlum element of Anchorage are on you, a Juneau jury. You will impress them just as much as you impress the good people of Anchorage with a just verdict * * *. The serious thing is this: Is this Chicago or New York, where the Marrone's can gun down the Iannitti's and get away with it or is this Alaska in 1959 * * *."

There was no objection by defendant's counsel to either of these remarks at the time they were made and no request for a cautionary instruction to the jury. Only at the conclusion of the Government's argument, when the court asked counsel to come to the bench to take exception to any of the instructions which the court was about to give to the jury covering the entire case, did counsel for the defendant voice an objection, stating:

"First I'd like to take very deep objections to the closing remarks made by the prosecuting attorney, which I had no opportunity to object since they were the closing sentences, in which he

also, in Screws v. United States, 1945, 325 U.S. 91, 101, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495, 1502 the Court stated that the term "willful" when used in criminal matters generally means an act done "with a bad purpose." See also State v. Allen, 1916, 98 Kan. 778, 99 Kan. 187, 160 P. 795.

12. The appellant arranged his specifications of error under six principal headnotes in his brief. For example, Specification 9 is the subject of headnote V, while headnote III dealt with Specifications 10 and 11.

in effect invited the jury to do just what the Court will admonish them not to do, convict Marrone because he is a hoodlum or because he is a part of the objectionable elements around here. Rather than giving a regard to the evidence in the case, Mr. Hayes, in his closing remarks, invited the jury to convict because Mr. Marrone was in effect a convict, a hoodlum, and therefore deserving of punishment, regardless of the evidence, a grossly inflammatory and erroneous statement, and one which should not have been made."

The word "hoodlum" as used by the prosecutor was a strong word and might best have been left unsaid, but the facts and circumstances of this phase of the case as gathered from the evidence are likewise strong against the defendant and no doubt stirred the prosecutor to utter strong words. But we cannot say that there was any prejudicial error committed. The picture which the defendant drew of himself for the jury was not one to evoke nods of approval. According to his own testimony he ran away from home at the age of fifteen years, became a law violator soon after, served time in the penitentiary for robbery, escape, and forgery, was married to a bar and night club "hostess", worked in bars and night clubs himself as bartender or manager, gambled for large sums of money, and considered it none of his business to assist the police in law enforcement.

For the most part, the persons with whom the defendant associated, including the decedent, belonged to the element who operated or worked in the "late action" night clubs of Anchorage, as brought out in the testimony. From this group the defendant drew his three male witnesses, all men with criminal records. It was this situation which caused the prosecutor to comment in his closing argument:

"* * * Look at the witnesses the defense brings before you. Every one of them without exception, as I recall it, is in the bar business as a bar owner, a B-Girl joint manager or waitress or waitress-cook. It is important that you see, Ladies and Gentlemen, that those people have one common enemy, the law, and they will stick together in the face of it. I don't recall a single witness they put on that didn't have a criminal record * * *"

At this point defendant's counsel interposed: "Now, I think that is * * *" and then the prosecutor continued

"* * * except, and I am going to add this, * * * except the two women * * *."

The defendant relies heavily upon the case of People v. Hoffman, 1948, 399 Ill. 57, 77 N.E.2d 195, in which the state's attorney in his argument to the jury referred to defendant's alibi as being false and to his sister-witness as an exconvicted burglar, and stated that he believed that there was lying and perjury involved in the case on the part of defendant's brothers and sisters, twice told the jury that he would not ask them to send the defendant to the penitentiary if he and his associates were not positive of their guilt, and stated that if he had one slightest reasonable doubt about the defendant's guilt he would dismiss the case, adding, "But I know all the facts of this case as you know various people." The Illinois supreme court stated that under the defendant's contention that the language of the state's attorney was in violation of the oft-stated rule that inflammatory remarks made to the jury have no place in a criminal trial, the sole question was whether or not there was sufficient basis in the record to justify the statements of the state's attorney. The court held that the statements were improper and prejudicial, in view of the evidence. In the instant case we find ample support in the evidence for the forceful language used by counsel for the Government.[13]

13. For other cases in which the courts have applied the rule that the use of violent language by the prosecutor in a criminal case to describe the defendant, his witness, or situations connected with the case is not error, if it is borne out

2. Appellant's second objection is to that part of the argument in which counsel for the Government referred to the failure of the defendant to call his wife as a witness. Looking to the record, we find the following dialogue of court and counsel:

Mr. Hayes for the Government in his argument to the jury: "And then here is a man who uses friends who are in the same line of business, who have no use for the police or law, in order to support his alibi, and his alibi is that he was with his wife eating at the time this thing took place. We can't bring his wife. Just as soon as we bring her down here there will be an objection. You know that. A man cannot—we cannot have a wife testify against her husband."

Mr. Kay, counsel for the defendant: "That is a misstatement, your Honor, and I object to it. There is nothing to prevent the Government from subpoenaing Mrs. Marrone if they want to and putting her on the witness stand. It is a privilege which must be claimed."

Mr. Hayes: "It is improper for us to attempt to do something so that they can get an effect * * *."

Mr. Kay: "That is a ridiculous argument. I hesitate—I never interrupt, but that is entirely improper. He could have subpoenaed Mrs. Marrone, if he wanted to; he knows it."

The Court: "Yes, I think that is a correct statement of the law, Mr. Kay, he could have subpoenaed her, but whether or not she could testify, that is something else."

Mr. Kay: "She could testify unless the privilege was claimed, your Honor."

The Court: "That is correct and I think that is a clear statement of the law, and neither counsel would state argument with the court."

Mr. Hayes: "No, not I. I won't argue on the power of the subpoena, but why didn't he bring her? * * * She is the one who could help support the alibi * * *."

We hold that the court was correct in permitting the remarks of Mr. Hayes to stand and that no prejudicial error was committed. The trial judge made it quite clear in his remarks to counsel that the Government had it within its power to subpoena Mrs. Marrone but not to compel her to testify. The record indicates that the entire colloquy took place in the presence and hearing of the jury, and so they were as much alerted to the failure of the Government to subpoena Mrs. Marrone as to the failure of the defendant to call her. It should be remembered, too, that the defendant had testified in his own behalf.

While there are cases holding that it constitutes prejudicial error for the prosecutor to refer to the failure of the defendant to

by the evidence adduced at the trial, see People v. Burnette, 1940, 39 Cal.App. 2d 215, 102 P.2d 799, 806, 807, a rape case in which the defendants were referred to as "yellow rats" and the jury asked to free San Francisco of their ilk; Johnston v. United States, 9 Cir., 1907, 154 F. 445, 449 an Alaska case involving an assault with a dangerous weapon in which the defendant was described as "this hired gun-fighter, this hired ruffian"; United States v. Pickens, 1957, 148 F.Supp. 652, 657, 16 Alaska 679, affirmed 9 Cir., 261 F.2d 438 (defendants designated as "barroom bullies"); People v. Carr, 1952, 113 Cal.App.2d 783, 248 P.2d 977, 980, in which the defendant was charged with rape and referred to as a "sex-crazed hoodlum"; People v.

Quock Wong, 1954, 128 Cal.App.2d 552, 275 P.2d 778, 780, tried for pandering, defendant was called a "wholesale peddler of fallen women" and "a man who will live off the earnings of fallen women is of the lowest order"; and State v. Perry, 1946, 24 Wash.2d 764, 167 P.2d 173, 176, wherein the defendant, accused of assault with intent to commit rape, was referred to by the prosecuting attorney as "mad dog" and "beast". Said the appellate court in the case last cited, "It is within the range of legitimate argument for the prosecuting attorney to characterize the conduct of the accused in language which, although it consists of invective or opprobrious terms, accords with the evidence in the case."

call his wife as a witness,[14] we favor the view and hold accordingly that the prosecution may comment on the failure of the accused to call his wife as a witness where she possesses knowledge of some fact relating to the crime. State v. McLaughlin, 1939, 126 Conn. 257, 10 A.2d 758; Melton v. State, 1927, 110 Tex.Cr.R. 439, 10 S.W.2d 384; Hilyard v. State, 1950, 90 Okl.Cr. 435, 214 P.2d 953, 960, 28 A.L.R.2d 961.

In State v. McLaughlin, supra, there was testimony introduced as in the instant case that the wife was having dinner with her husband at the time the crime was committed. The Supreme Court of Connecticut held that it was proper for the prosecuting attorney to comment on the fact that the wife who obviously should be able to furnish an alibi did not testify on her husband's behalf.[15] Under Alaska law in a criminal action against one spouse, the other is a competent witness against the accused.[16] That being true, then, in circumstances such as exist in this case, where the defense is an alibi and the wife might have bolstered up that alibi, we hold that the prosecution may comment upon the unfavorable inference produced in a reasonable mind by the failure of the defendant to call his wife as a witness.

3 and 4. The appellant claims that it was prejudicial error for the prosecutor to tell the jury what witnesses he believed and which ones he considered to be liars, and to color his argument with reference to B-Joints and ask for a conviction of the defendant as a strike at the "hoodlum" element watching the case. We agree with counsel for the appellant that the use of language by the prosecutor, calculated to prejudice the defendant and not justified by the evidence, is improper and censurable and should be discountenanced by the court. In this case, however, we reiterate that the evidence did justify and sustain the argument of counsel for the Government. It was the appellant's own witness who referred to the bars and night clubs involved in this case as "B-Girl Joints." From a careful consideration of all the evidence on these issues, we find no prejudicial error in any of the prosecutor's remarks as claimed by the defendant.

In Grandsinger v. State, 1955, 161 Neb. 419, 73 N.W.2d 632, 650, the Nebraska court quoted with approval, and so do we, the rules it had laid down in an earlier case,[17] as follows:

"It must always be remembered in this connection that 'An appeal for con-

14. Wilson v. Commonwealth, 1932, 157 Va. 962, 162 S.E. 15; Fannie v. State, 1912, 101 Miss. 378, 58 So. 2; People v. Terramorse, 1916, 30 Cal.App. 267, 157 P. 1134; People v. Klor, Cal.App.1949, 190 P.2d 643, certiorari denied 336 U.S. 920, 69 S.Ct. 642, 93 L.Ed. 1082; State v. Swan, 1946, 25 Wash.2d 319, 171 P.2d 222, 226. In the Klor case the California court declared that it was deceptive and unfair for the prosecutor, without any intention of using the defendant's wife as a witness, to call out her name in the courtroom thereby intentionally conveying to the jury his belief that her testimony would have been favorable to the prosecution.

15. For an excellent résumé of cases pro and con and Professor Wigmore's views on the question of whether it is error for the prosecutor to comment upon the failure of the defendant to call his wife as a witness, see State v. Dennis, 1945,

177 Or. 73, 159 P.2d 838, 848–853, 161 P.2d 670.

16. Section 66–13–58, A.C.L.A.1949. "*Husband or wife as witness.* That in all criminal actions where the husband is the party accused the wife shall be a competent witness, and when the wife is the party accused the husband shall be a competent witness; but neither husband nor wife, in such cases, shall be compelled or allowed to testify in such case unless by consent of both of them: Provided, That in all cases of personal violence upon either by the other, the injured party, husband or wife, shall be allowed to testify against the other."
Our statute is identical with the pertinent portion of the Oregon statute (O.C. L.A. § 26–935) set forth at length in the Dennis case, supra.

17. Lee v. State, 1932, 124 Neb. 165, 245 N.W. 445, 446.

viction, based altogether upon the evidence, however fervent it may be, is not an abuse of the privilege of advocacy' * * * So, too, it is not misconduct on the part of the prosecuting attorney, but is indeed his duty, to comment upon the credibility and conduct of the defendant's witnesses, based on the evidence and facts properly before the jury.''

Defendant's specifications Nos. 5 and 12 are argued by him in his brief under the headnote ''VI The Court Erred in Limiting the Cross-Examination of Helen Iannitti and Don Kane and in Rejecting the Offer of Proof in Connection therewith; The Court Belittled the Witness Helen Iannitti.''

The record discloses that the defendant sought to cross-examine the decedent's wife, Helen, as to her husband's character and background on the theory that it would be important to the court and jury in arriving at any proper inferences as to the cause of death and that defendant had nothing to do with it, if it developed that the victim died at the hands of an unknown assailant under unknown circumstances. On objection by the Government, the court ruled against the defendant but only as to this phase of background and character evidence. The court considered the evidence offered by the defendant to be negative in nature and, therefore, improper, unless the plea had been one of self-defense. Later on, the court also sustained an objection to any cross-examination of this witness as to violent and brutal conduct of the deceased while intoxicated. Counsel for the defendant argued to the court that though the defense was an alibi, the jury might conclude that the defendant was present when the victim was

shot and, if they had this evidence of violence on the part of the victim before them, they might further conclude that the gun went off during a struggle or was fired on sudden impulse. This argument is further developed in the defendant's brief, but it is admitted that no authority was found in support thereof. Neither have we been able to find any. In fact, the principle seems to be quite well established that evidence as to the character or reputation of the deceased for turbulence or violence is not admissible unless the defendant is relying on self-defense or justification for his act.[18] Since the defendant here was relying solely on the defense of an alibi and has never departed therefrom, we find that there was no error in the exclusion of the proffered evidence.

As to witness Kane, the defendant proposed to show by cross-examination that in either San Francisco or Los Angeles one ''Little Joe'' expressed his intention ''to get'' the decedent. In his brief the defendant intimates that this ''Little Joe'' may have been the unknown Joe who entered the Pink Garter, according to the defendant, shortly before Iannitti was shot. This is pure conjecture. But even if Joe or Little Joe had been established as a very definite character that fact alone would not have afforded a legal basis for introducing into this case any threats that he may have made against the victim in San Francisco or Los Angeles. The rule is that threats by a third person against the victim may not be shown unless coupled with other evidence having an inherent tendency to connect such other person with the actual commission of the crime. People v. Mendez, 193 Cal. 39, 223 P. 65, 70.[19]

---

18. People v. Talle, 1952, 111 Cal.App.2d 650, 245 P.2d 633, 646; Sullivan v. State, 1936, 47 Ariz. 224, 55 P.2d 312; Cone v. State, 1942, 193 Ga. 420, 18 S.E.2d 850; Commonwealth v. Letherman, 1935, 320 Pa. 261, 181 A. 759; State v. Gray, 1956, 179 Kan. 133, 292 P.2d 698, 700.

19. The Government (State) in its brief, calls our attention to a later California

case, People v. Perkins, Cal.App., 59 P. 2d 1069, affirmed 1937, 8 Cal.2d 502, 66 P.2d 631, in which the rationale for the rule is given at pages 1074 and 1075 of 59 P.2d, as follows:

''The decisions in other states are not completely harmonious upon this question. But they are substantially unanimous in holding that mere evidence of motive in another person, or of motive

We find no evidence in the record to connect "Little Joe" with the "Joe" described by the defendant, let alone evidence to connect "Little Joe" with the commission of the crime charged and, therefore, hold that the lower court committed no error in sustaining an objection to evidence of threats against the deceased by "Little Joe."

Finally, under headnote VI of his brief, appellant contends that the trial court repeatedly erred by improper comments concerning witnesses and evidence in the presence of the jury, but the only specific instance of such alleged misconduct which he discusses in his brief is that relating to the interrogation by the court of the Government's witness Helen Iannitti. The record shows that she was being assiduously examined by the prosecutor on redirect as to whether or not she could identify the occupant of the cab which she passed on her way to the Pink Garter.[20] On direct examination she had positively and unhesitatingly identified the defendant as the occupant of the taxicab. When cross-examined on this point and asked whether she might not have been mistaken, she answered, "Well,—He is of a certain type that looks like a lot of people, it's true." As to the redirect examination on the matter in issue here and the interroga-

tion by the court, we quote from the transcript of the testimony:

"Q. * * * And what did you tell the members of the jury [on direct examination] so far as the identity of that person was concerned? A. I don't understand the question?

"Q. Didn't you tell—who was the man in the cab; what did you tell the members of the jury on direct examination as to who the man in the cab was? A. Marrone.

"Q. Was it Mr. Marrone in the cab? A. (Pausing looking at Mr. Marrone.) I have to be sure of this; I mean I can't—people have taken other people—

"Q. Mrs. Iannitti, I am asking you a simple question?

"Mr. Kay: Let's let the witness answer the question, Mr. Hayes, to the best of her ability; I realize you are impatient, but—

"The Court: You may answer the question. Do you understand the question? A. I understand the question, yes, but it has to be—you have to bet your life on it and that is a hard thing to do; it is like going up to identical things—something wrong on

coupled with threats of such other person, is inadmissible unless coupled with other evidence tending to directly connect such other person with the actual commission of the crime charged. See notes to 1 Wigmore on Ev. (2d Ed.) §§ 139–142. The learned author criticizes the rationale of these decisions somewhat severely, but concedes that they are substantially unanimous upon this point. It seems to us that there is a sound basis for this rule and that it rests fundamentally upon the same consideration which led to the early adoption of the elementary rules that evidence to be admissible must be both relevant and material. It rests upon the necessity that trials of cases must be both orderly and expeditious, but they must come to an end, and that it should be a logical end. To this end it is necessary that the scope of inquiry into collateral and un-

important issues must be strictly limited. It is quite apparent that if evidence of motive alone upon the part of other persons were admissible, that in a case involving the killing of a man who had led an active and aggressive life it might easily be possible for the defendant to produce evidence tending to show that hundreds of other persons had some motive or animus against the deceased; that a great many trial days might be consumed in the pursuit of inquiries which could not be expected to lead to any satisfactory conclusion."

See also Gatewood v. State, 1945, 80 Okl.Cr. 135, 157 P.2d 473; and McElroy v. State, 1911, 100 Ark. 301, 140 S.W. 8.

20. This incident is mentioned in our summary of the evidence at page 972 of this opinion.

one of them—if I am wrong, then I —

"By Mr. Hayes:

"Q. What is your answer to that, Mrs. Iannitti? A. (Witness is pausing and wringing her hands.)

"Q. Could it be, Mrs. *Innatti,* that you don't want to answer it now?

"Mr. Kay: May I ask if Mrs. Marrone—Mrs. Iannitti realizes that she can answer that question, she doesn't have to answer that question, yes or no, if she isn't sure; I am under the impression that she is under the impression that she has to answer that yes or no. Are you under such impression?

"The Court: Well, just a moment, please, Mr. Kay; how far did you go to school, Mrs. Iannitti? A. Not too far.

"The Court: Well, how far is 'too far'? Well, did you go to the eighth grade? A. Yes.

"The Court: Did you go to high school? A. Yes, I went to the tenth grade.

"The Court: You went to the tenth grade; did you complete the tenth grade? A. No.

"The Court: Now, you read and write English, do you not? A. I can read.

"The Court: And you understand the English language, do you not? A. Certainly.

"The Court: Thank you. You may proceed."

The defendant contends that the questions interjected by the court had the purpose and effect of embarrassing and demeaning the witness. We cannot read such a purpose or effect into the questions asked by the court. Defendant further urges that the effect here was similar to the effect produced by the conduct of the trial court in the Alaska case of De Groot v. United States,[21] in which the United States Court of Appeals for the Ninth Circuit held that it was prejudicial error for the trial judge to remark in the presence of the jury that the witness being examined was "trying to build herself up." Without passing upon the soundness of that decision at this time, we are moved to say that the appellate court had under consideration there words by the trial judge which expressed his personal opinion of a witness in the case. In the case before us the record discloses that Mrs. Iannitti did not fully understand the questions propounded to her or was reluctant to answer. We find that the questions were proper to show that the witness did have sufficient education and comprehension to answer the questions propounded to her.[22] Appellant does not claim that the trial judge indicated by his physical demeanor any bias, prejudice or opinion, and we assume, therefore, that there was nothing objectionable in his expression, inflection of voice, or manner of propounding the questions. As a final observation, we note that the trial judge properly instructed the jury that they were the sole judges of the effect and value of evidence addressed to them and that they were to disregard entirely any opinion that he might have, or that they might think he had expressed on the facts of the case.

As his specifications Nos. 6 and 7, the defendant claims error in the refusal of the court to grant his motion for judgment of acquittal at the close of the Government's case and as renewed at the close of all the evidence. The record does show that the motion for judgment of acquittal was made on the ground that the

21. 9 Cir., 1935, 78 F.2d 244, 249.

22. See People v. Boggess, 1924, 194 Cal. 212, 228 P. 448, 460; People v. Miller, 1931, 114 Cal.App. 293, 299 P. 742; State v. Neil, 1937, 58 Idaho 359, 74 P.2d 586, 589; State v. Keehn, 1911, 85 Kan. 765, 118 P. 851, 857–859; State v. Roberts, 1916, 91 Wash. 560, 158 P. 101; State v. Gleason, 1935, 86 Utah 26, 40 P.2d 222, 227; Miller v. Miller, 1952, 79 N.D. 161, 55 N.W.2d 218.

evidence failed to establish a case on which the defendant could be convicted. Since the defendant does not argue these assignments of error in either his opening or his reply brief, we can only consider them on the basis of the record before us and our prior rulings herein on all of the assignments of error specifically argued in the briefs. On that basis, we find that the refusal of the trial court to grant the motion for judgment of acquittal suggests no abuse of discretion and was fully justified by the record. We have carefully read and considered that record ourselves and are convinced that the defendant has had a fair trial and that the issues presented by him and others in his defense were fairly and adequately presented to the jury and that the evidence in its entirety was sufficient to support the verdict of the jury.

The judgment is affirmed.