**Richard R. JAMES, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 6981.**

Court of Appeals of Alaska.

Nov. 4, 1983.

---

Charles R. Pengilly, Asst. Public Defender, Fairbanks, and Dana Fabe, Public Defender, Anchorage, for appellant.

Thomas A. Miller, Asst. Dist. Atty., Harry L. Davis, Dist. Atty., Fairbanks, Peter A. Michalski, Asst. Atty. Gen., Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, Chief Judge, SINGLETON, J., and HODGES, Superior Court Judge.*

## OPINION

BRYNER, Chief Judge.

Richard James was convicted by a jury of assault in the first degree in violation of AS 11.41.200(a). Superior Court Judge Gerald J. Van Hoomissen sentenced James to serve fifteen years' incarceration. James appeals, contending that several errors occurred at his trial; he also attacks his sentence as excessive.

## FACTS

The events that led to James's conviction began late in the evening of January 9, 1980, when Chester Druck visited James and Marilyn Horace at the house James shared with Horace in Fort Yukon. Druck testified that he spent the early hours of January 10 with James and Horace, "drinking whisky, playing [the] guitar, [and] joking around." According to Druck, at around 8:00 a.m., he was standing at a counter mixing a drink when he heard James approaching from a back room. Druck turned to face James, and James stabbed him in the abdomen with a knife. Druck testified that he "guessed" James stabbed him out of jealousy over Horace, but Druck was not aware of anything that might have provoked James to jealousy. Druck ran out of the house after being stabbed and soon lost consciousness. He was taken to the Fort Yukon health clinic

* Hodges, Superior Court Judge, sitting by assignment made pursuant to article IV, section 16 of the Constitution of Alaska.

and was later flown to Fairbanks for surgery.

## SUFFICIENCY OF EVIDENCE TO SHOW SERIOUS PHYSICAL INJURY

■ As a result of the stabbing, the state charged James with first-degree assault. The state charged James under two separate statutory theories of the offense: first, the state alleged that James, acting with intent to inflict serious physical injury, actually inflicted physical injury by stabbing Druck (AS 11.41.200(a)(1)); second, the state alleged that James, acting under circumstances manifesting extreme indifference to the value of human life, actually inflicted serious physical injury by stabbing Druck (AS 11.41.200(a)(3)). At trial, James moved for a judgment of acquittal as to the second theory. He contended that the state failed to present sufficient evidence to show that Druck suffered serious physical injury as a result of the stabbing. James now argues that the trial court's denial of his motion for a judgment of acquittal was erroneous.

Dr. James Borden testified at James's trial as an expert witness for the state. Dr. Borden saw Druck in the emergency room upon Druck's arrival in Fairbanks. Borden testified that Druck was in stable condition upon admission and that he was taken to the operating room so that the extent of his injuries could be ascertained. Examination disclosed that the knife went through Druck's abdominal wall, piercing the inferior vena cava, a large vein located at the back part of the abdomen, against the spine. Over defense objection, the state was allowed to ask Dr. Borden what risk of death this type of injury posed to Druck. Borden responded:

Injuries to the inferior vena are pretty much across the board considered very dangerous injuries.... A large series of studies have shown that thirty-six percent of people injured in the inferior vena cava don't arrive alive at the hospital. Of those that do arrive alive and go to surgery for treatment, fifty-seven per-

cent of these will still die. So based on those figures it—it's a dangerous injury.

When asked how he could explain Druck's survival in light of the serious risk of death posed by his injury, Dr. Borden said that Druck was one of the lucky few:

A certain percent of these do well. Those that do poorly do very poorly, as I mentioned, and a lot of them die. Those that do well, most of them don't have—it—it's one of these things when you sort of do well or you—or you don't. If you're one of those that is capable of clotting the blood as it comes out of the vein, then this bloodclot can actually form pressure against the inferior vena cava and cause it to not bleed further.

James's objection to Dr. Borden's testimony and his motion for a judgment of acquittal at trial were based on the argument that Druck himself was never actually close to death. James contends that, in applying the definition of first-degree assault in AS 11.41.200(a)(3), "serious physical injury" must be established solely by evidence of the victim's actual physical condition and proximity to death, and not by a generalized and objective inquiry into the risk of death normally associated with the particular type of injuries suffered.

The trial court found this reasoning unpersuasive, stating:

[T]o say that a man can get a bullet through the heart or an aim shot through the brain or something like that and through some fluke of medical science and natural science he survives, I don't think that's what our legislature was aiming at. There was a knife thrust into the abdomen where you have a stomach, you have the intestines, you have all kinds of things that can result in serious physical injury.

On appeal, James renews the arguments rejected by the trial court. James contends that, since Dr. Borden's testimony established that Druck himself was never actually close to death after being stabbed, he did not suffer "serious physical injury." Former AS 11.81.900(b)(49) defined "serious physical injury" as:

physical injury which creates a substantial risk of death or which causes serious and protracted disfigurement, protracted impairment of health, or protracted loss or impairment of the function of a bodily organ, or physical injury which unlawfully terminates a pregnancy; . . . .

James relies on two Oregon cases interpreting a statute upon which former AS 11.81.-900(b)(49) was modelled.[1] In *State v. Dillon*, 24 Or.App. 695, 546 P.2d 1090 (1976), the defendant fired a shot that struck the victim in the head. Because the bullet was deflected and lost much of its velocity, it merely caused a half-inch laceration along the victim's eyebrow. The victim required only a "bandaid and a stitch." *Id.* 546 P.2d at 1092. In *Dillon,* the prosecution failed to present any evidence that the injury created a substantial risk of death but it did attempt to show that "serious physical injury" occurred because the victim suffered "protracted impairment of health." Contrary to James's assertion, the *Dillon* court's conclusion that the victim did not suffer serious physical injury does not stand for the proposition that such injury can be established only by evidence of the victim's actual medical condition. Instead, the decision reflects the state's failure to present any medical evidence at all as to risk of death.

*State v. Mayo,* 13 Or.App. 582, 511 P.2d 456, 458 (1973), is more relevant. There, the state presented medical testimony that the victim's injuries had created a substantial risk of death; however, the testifying physician was unwilling to state that the victim's injuries created more than a "possi-

bility" of a risk of death. We find *Mayo* to be distinguishable from James's case. *Mayo* indicates that a finding of serious physical injury may not be based on a risk of death that rises only to the level of possibility. The case suggests that risk of death must at least be probable before serious physical injury is established. *Mayo* does not, however, intimate that risk of death must be shown exclusively by the actual physical condition of the victim or by the victim's ability to tolerate and recover from the injury. Nothing in *Mayo* precludes proof of the extent of risk ordinarily associated with the type of injury inflicted. Here, we note that Dr. Borden specifically testified that there was a substantial risk that Druck would die.[2]

We have had occasion to consider the sufficiency of testimony relating to serious physical injury in one prior case. In *Frankson v. State,* 645 P.2d 225 (Alaska App. 1982), the defendant moved for a judgment of acquittal, alleging that the evidence failed to show serious physical injury. We concluded that the evidence was adequate to create a jury question, since a physician testified that the victim's injuries fell within the definition of "serious physical injury" contained in AS 11.81.900(b)(49). James argues that our focus in *Frankson* was on the "victim himself and the danger in which he was placed by the injuries suffered." This is a misreading of our opinion. Although we considered evidence of the victim's actual condition, we also took into account evidence that he was admitted to the hospital "because concussions like the one [he] received can pose a threat of death." In

---

1. ORS 161.015 states, in pertinent part:
   *General definitions.* As used in chapter 743, Oregon Laws 1971, and ORS 166.635, unless the context requires otherwise:
   (7) "Serious physical injury" means physical injury which creates a substantial risk of death or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ.

2. In this case, the statistics furnished by Dr. Borden's testimony established that the risk of death was greater than the chance for survival in cases involving injuries similar to Druck's.

Accordingly, we need not decide at what point a risk of death becomes "substantial" within the meaning of AS 11.81.900(b)(49). We express no opinion as to the *Mayo* court's holding that probability of death must be shown before substantial risk is established. While in *Frankson v. State,* 645 P.2d 225 (Alaska App.1982), we held that serious physical injury had been proven where testimony indicated a ten to twenty percent chance of death, appellant did not argue that a probability of death must be shown or that a ten to twenty percent risk of death was *per se* insufficient to support a finding of serious physical injury.

addition, our decision relied in part on testimony by the state's physician indicating that he had observed similar head injuries and he "believed that [the victim], at the time he was admitted to the hospital, faced a ten to twenty percent chance of dying from his injuries." *Id.* at 230.

We are not persuaded that the interpretation of AS 11.81.900(b)(49) urged by James is correct. It makes little sense to focus exclusively on the victim's personal ability to tolerate or recover from an injury, without reference to the seriousness of the risk the injury poses at the time of its infliction. Such a myopic view would, if carried to its logical conclusion, simply render AS 11.81.900(b)(49) meaningless. By focusing exclusively on the victim's actual response to injury, it could be argued in virtually any case where the victim of a violent assault survived that the actual risk of death was nonexistent. The view advocated by James would make determination of serious physical injury dependent upon such factors as the assailant's luck in choosing a victim more resilient to serious physical injury than the average person or one with better access to competent medical assistance. In short, identical acts causing identical injuries would be subject to radically different legal consequences.

We believe it is far more appropriate to evaluate the nature of the injuries inflicted rather than the individual victim's physiological response to that injury. A plain reading of former AS 11.81.900(b)(49) supports this view. The statute specifically

defined serious physical injury in terms of the extent of risk caused, not by the physical effects of an injury on the victim: " 'Serious physical injury' means physical injury which creates a substantial risk of death...." This definition is injury-specific and not victim-specific; the ordinary and probable consequences of the particular type of injury inflicted are the essential criteria by which serious physical injury must be determined. The actual physical response of the victim, while obviously a relevant circumstance, is not controlling.[3] We hold that the trial court properly allowed presentation of evidence concerning the statistical risk of injuries such as those suffered by James's victim. We further hold that the court did not err in finding that this evidence was sufficient to allow the question of serious physical injury to be submitted to the jury.

## JURY UNANIMITY

The next error alleged by James involves the jury instruction on assault in the first degree. As already mentioned, James was charged with first-degree assault under the alternative definitions of the offense contained in AS 11.41.200(a)(1) and AS 11.41.-200(a)(3).[4] The information alleged that James

> unlawfully and with intent to cause serious physical injury to Chester Druck, caused physical injury to him by means of a dangerous instrument, a knife; or, unlawfully and intentionally performed an act resulting in serious physical injury to

---

**3.** Our conclusion is buttressed by the legislature's recent amendment to AS 11.81.-900(b)(49), which emphasizes the risk of death created by the *act* causing the injury rather than the risk caused by the injury itself:

"serious physical injury" means
  (A) physical injury caused by an act performed under circumstances that create a substantial risk of death; or
  (B) physical injury that causes serious and protracted disfigurement, protracted impairment of health, protracted loss or impairment of the function of a body member or organ, or that unlawfully terminates a pregnancy;
    . . . .
While this amendment was not effective when James stabbed Druck, it is useful as the most

recent expression of legislative intent. *See Whittlesey v. State,* 626 P.2d 1066, 1068 (Alaska 1980).

**4.** AS 11.41.200(a)(1) and (3) provide:
  A person commits the crime of assault in the first degree if
  (1) with intent to cause serious physical injury to another person, he causes physical injury to any person by means of a dangerous instrument;

    . . . .
  (3) he intentionally performs an act that results in serious physical injury to another person under circumstances manifesting extreme indifference to the value of human life.

Chester Druck, to-wit: stabbing him with a knife, under circumstances manifesting extreme indifference to the value of human life.

The trial court's assault instruction combined the alternative definitions of the offense contained in AS 11.41.200(a)(1) and (3), thus permitting individual jurors to render a general verdict convicting on either theory:

The law applicable to the crime charged in the information is found in Alaska Statute 11.41.200, Assault in the First Degree. This law states that:

A person commits the crime of assault in the first degree if with intent to cause serious physical injury to another person, he causes physical injury to any person by means of a dangerous instrument *or* he intentionally performs an act that results in serious physical injury to another person under circumstances manifesting extreme indifference to the value of human life.

In order to establish the crime of assault in the first degree, it is necessary for the State to prove beyond a reasonable doubt the following:

First, that the event in question occurred at or near Ft. Yukon, Alaska, and on or about January 10, 1982;

Second, that Richard R. James intended to cause serious physical injury to Chester Druck;

Third, that Richard R. James caused physical injury to Chester Druck; and

Fourth, that he did so by means of a dangerous instrument, a knife.

#### OR

First, that the event in question occurred at or near Ft. Yukon, Alaska, and on or about January 10, 1982;

Second, that Richard R. James intentionally performed an act; to-wit, stabbing Chester Druck with a knife;

Third, that the act resulted in serious physical injury to Chester Druck; and

Fourth, that the act was performed under circumstances manifesting extreme indifference to the value of human life.

If you find from your consideration of all the evidence that each of these elements under either method of committing assault in the first degree has been proved beyond a reasonable doubt, then you shall find the defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that any of these elements required to be proven under either method of committing assault in the first degree has not been proven beyond a reasonable doubt, then you shall find the defendant not guilty.

Defense counsel and the prosecutor joined in objecting to this instruction. James's counsel noted that the disjunctive "or" form of the instruction created a possibility of non-unanimous verdicts; he suggested that separate verdict forms would eliminate this possibility. The prosecution agreed that separate verdict forms were desirable. The trial judge, however, refused to require separate verdict forms:

I'm not going to give separate verdicts. I don't think the jury has to—all they have to do is find him guilty or not guilty of assault in the first degree, second degree. I don't think they have to tell how they did it or what the basis of their deliberations were. So you'll have an exception to that extent.

■ James contends that the instruction violated Alaska Criminal Rule 31(a), which requires that jury verdicts in criminal cases be unanimous. He also claims that the instruction violated his sixth amendment right to conviction by a substantial majority of the jury. *Johnson v. Louisiana,* 406 U.S. 356, 362, 92 S.Ct. 1620, 1624, 32 L.Ed.2d 152, 159 (1972). James argues that half the jury could have found that he assaulted Chester Druck under the first theory charged but not under the second theory, while the other half could have concluded that only the elements of the second theory had been proven beyond a reasonable doubt.

There is general agreement that the right to a unanimous jury verdict is not violated when non-unanimity exists only as to the exact mode of commission of a specific offense. *See, e.g., State v. Encinas,* 132 Ariz. 493, 647 P.2d 624, 627 (1982); *State v. Wixon,* 30 Wash.App. 63, 631 P.2d 1033, 1042 (1981); *State v. Garvin,* 28 Wash.App. 82, 621 P.2d 215, 216–17 (1980). However, courts take varying positions as to when potential lack of unanimity involves more than different modes of committing the same offense. *Compare United States v. Gipson,* 553 F.2d 453, 458–59 (5th Cir.1977) (possible jury non-unanimity as to the *actus reus* element of an offense is impermissible if acts charged disjunctively fall within "different conceptual groupings"), *and Jackson v. State,* 92 Wis.2d 1, 284 N.W.2d 685, 689–90 (App.1979) (unanimity requirement violated by instruction that jurors could convict if they found that theft offense was accomplished by any one of several varied means, but instruction was harmless error because evidence indicated that defendant could have committed the theft in only one way), *with Wells v. Commonwealth,* 561 S.W.2d 85, 88 (Ky.1978) (possible jury non-unanimity created by jury instructions containing alternate theories of assault permissible so long as ample evidence exists to support a conviction based upon either theory of assault).

██ In considering this issue we start with the premise that the accused has a right to a unanimous verdict: a conviction may properly be entered only if the jury unanimously finds that all essential elements of the offense charged were proved beyond a reasonable doubt. Alaska R.Crim.P. 31(a). Where, as here, a statute defines two or more separate ways to commit a crime, the question is whether the alternative statutory definitions actually describe the same offense. In other words, does the statute merely define a single offense capable of being committed in more than one way or does it set out a number of separate and distinct offenses, all subsumed under a single name? *See, e.g., State v. Arndt,* 87 Wash.2d 374, 553 P.2d 1328, 1330 (1976).

██ Resolution of this question may often prove difficult, since the distinction between different means of committing the same offense and separate, but interrelated, offenses is primarily one of degree. We believe, however, that the most useful approach is to compare alternative definitions of the offense in question and determine whether each definition requires proof of the same or substantially similar basic elements. In particular, alternative statutory definitions of an offense should be examined and compared for differences in the required conduct, mental state, and result or attendant circumstances. Where differences in conduct, intent or circumstances are significant, the jury should be required to render a verdict that is unanimous as to a particular theory. *See, e.g., United States v. Gipson,* 553 F.2d 453, 455–56 (requirement of unanimity prohibits a conviction based on a finding that the defendant either possessed or sold stolen property, since possession and sale involve acts that are "conceptually distinct"). In marginal cases, preference should be given to the requirement of jury unanimity. *See Christie v. State,* 580 P.2d 310, 322 n. 41 (Alaska 1978) ("where a statute uses disjunctive language, the preferred procedure is to require an election by the state as to the particular element to be proved").

██ In the present case, the trial court instructed the jury as to the alternative definitions of first-degree assault contained in AS 11.41.200(a)(1) and AS 11.41.200(a)(3), and the jury was permitted to return a general verdict convicting James of assault without necessarily agreeing on the definition under which his guilt was determined. A comparison of the alternative definitions leads us to conclude that these two provisions require proof of essential elements that are substantially different.

Under the trial court's instructions, the jury could have found (1) that James stabbed Druck; (2) that he did so with specific intent to cause serious physical injury; and (3) that he actually caused physical injury. Alternatively, the jury could

have found (1) that James stabbed Druck; (2) that he actually caused serious physical injury; and (3) that he did so under circumstances manifesting extreme indifference to the value of human life. Some jurors might have found that James was guilty under AS 11.41.200(a)(1) by concluding that he intended to cause serious physical injury and actually caused some physical injury but that he did not inflict serious physical injury. Other jurors might have found that James was guilty under AS 11.41.200(a)(3) by concluding that he was too intoxicated to form a specific intent to cause serious physical injury, but that he acted with extreme indifference and actually caused serious physical injury.

The differences in intent in the alternative statutory provisions might not, standing alone, be significant, since a finding of specific intent to inflict serious injury would encompass extreme indifference to the value of human life. See AS 11.81.-610(c). Similarly, the difference in the extent of injury required would not, by itself, be significant, since a finding of serious physical injury would necessarily include a finding of physical injury. See, e.g., Christie v. State, 580 P.2d 310, 322 (Alaska 1978). However, taken together these differences are significant. It is possible that the jury unanimously agreed only that James stabbed Druck under circumstances manifesting an extreme indifference to human life and that he inflicted some physical injury. Yet these findings would suffice to constitute no more than an assault in the third degree, a class A misdemeanor.[5]

Given the significant differences between the essential elements of the two alternative statutory theories, we must conclude that the trial court's failure to require a separate verdict for each theory created an impermissible risk that the jury's verdict would not reflect unanimous agreement as to all material elements of either AS 11.41.-200(a)(1) or AS 11.41.200(a)(3).

Our conclusion is supported by the supreme court's holding in *Viveros v. State,* 606 P.2d 790 (Alaska 1980). There, the defendant was convicted of armed robbery after the trial court instructed the jury to determine whether the defendant had stolen property "by force and violence *or by* putting [the victim] in fear with a handgun." *Id.,* 606 P.2d at 793 (emphasis added). The court held that the disjunctive form of this instruction created the possibility that the jury was not unanimous on the issue of whether the defendant had used a handgun. Accordingly, the court reversed the armed robbery conviction. We believe the circumstances of *Viveros* are analogous to those of the present case. We therefore hold that James's conviction must be reversed.

## EXCLUDED TESTIMONY OF JENNY FILES

Since we have determined that James must receive a new trial and since it is likely that the issue will recur upon retrial, we will consider James's separate contention that the trial court committed error by excluding certain testimony of Jenny Files. James called Jenny Files, a Fort Yukon police dispatcher, as a witness at trial. James's trial counsel indicated that Files was prepared to testify about a phone call she received at approximately 3:30 a.m. on the morning of Druck's stabbing. According to James's trial counsel, Files would testify that she had been called by a woman who purported to be at the Horace residence and that this woman told Files, "get him out before I kill him." The prosecutor objected to the testimony on the ground that Files could not identify the caller with sufficient certainty.

In response, James's counsel stated that the testimony was being offered to show that Marilyn Horace could have stabbed Druck, since Files was ninety-seven or nine-

---

**5.** At the time of James's offense, AS 11.41.-230(a)(1) provided:

*Assault in the third degree.* (a) a person commits the crime of assault in the third degree if

(1) he intentionally or recklessly causes physical injury to another person; . . . .

ty-eight percent sure that the caller was Marilyn Horace and since the caller had identified herself as calling from a house in which she was the only woman resident. James's counsel also stated that the testimony was being offered to impeach Marilyn Horace's earlier testimony that she did not make any phone calls on the night of the stabbing. James's counsel was eventually allowed to ask Files how certain she was that the caller was Marilyn Horace. Files said, "I give it about a ninety-eight because the voice was so soft and there was music in the background, that's best I can do and I've thought about this for a long time." The court refused to allow admission of the evidence because Files was unable to say with certainty that, in her opinion, it was Marilyn Horace's voice.

James now maintains that the trial court's exclusion of this testimony was error. He argues that Jenny Files's inability to state with absolute certainty that Marilyn Horace was the caller should not have been a basis for exclusion because such doubt would properly have affected the weight and not the relevancy accorded her testimony.

In response, the state argues that exclusion of the testimony was proper because Horace could not be positively identified by Files. The state further contends, for the first time, that the evidence should also have been excluded because Files's testimony was uncorroborated and therefore inadmissible under *Marrone v. State,* 359 P.2d 969, 984 (Alaska 1961). There, the court held:

> The rule is that threats by a third person against the victim may not be shown unless coupled with other evidence having an inherent tendency to connect such other person with the actual commission of the crime. [citation and footnote omitted].

We conclude that Files should have been permitted to testify concerning the phone call. As James notes, Evidence Rule 801(d) does not require that a declarant be "positively identified." Since this testimony was relevant, determination of whether Marilyn Horace was indeed the caller should properly have been made by the jury, and not by the court. *See generally* A.R.E. 401, *Commentary* at 63–65.

We also find that the testimony was sufficiently corroborated under the *Marrone* standard. An examination of the facts of this case indicates that evidence of Horace's threat was "coupled with other evidence having an inherent tendency to connect [her] with the actual commission of the crime." *Marrone,* 359 P.2d at 984. We read *Marrone* to require corroboration sufficient to establish that the third party alleged to have threatened an assault victim was present at the scene of the offense when it occurred or otherwise had the opportunity to commit the crime. To require more would in effect be to establish a requirement of independent proof rather than of corroboration. In *Marrone,* the defendant attempted to prove that at some unspecified time, in either San Francisco or Los Angeles, someone named "Little Joe" had threatened to "get" the decedent; Marrone had testified that the decedent was in the company of someone named "Joe" in an Anchorage bar shortly before the shooting occurred. Thus, in *Marrone* there was no independent proof linking "Little Joe" to the crime scene. In James's case, by contrast, there is substantial evidence of Horace's presence at the scene when the stabbing occurred. It is sufficient for purposes of satisfying the *Marrone* corroboration requirement that Marilyn Horace was undeniably present when Chester Druck was stabbed; evidence of her presence at the scene sufficiently connects her with the commission of the crime and corroborates Files's testimony. *Cf. Larson v. State,* 656 P.2d 571, 574–75 (Alaska App.1982) (trial court did not abuse discretion in excluding evidence of a confession by a third party when evidence existed to corroborate that the third party had an opportunity to commit the offense).

Since the excluded testimony satisfied the *Marrone* corroboration requirement, the trial court could properly exclude it only if its probative value was "outweighed by the

danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." A.R.E. 403. We are unable to find that any of these possibilities outweigh the probative value of this testimony. On remand, James should be permitted to offer this testimony if he chooses to do so.

Our disposal of James's merit appeal makes it unnecessary for us to consider his sentencing argument. The conviction is REVERSED and the case is REMANDED.