**Earl Cornelius BATES, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–10350.**

Court of Appeals of Alaska.

June 3, 2011.

---

Beth Lewis Trimmer, Assistant Public Advocate, Appeals & Statewide Defense Section, and Rachel Levitt, Public Advocate, Anchorage, for the Appellant.

Eric A. Ringsmuth, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

MANNHEIMER, Judge.

Earl Cornelius Bates broke into the residence where his former girlfriend, Jessie Ouilette, was living. Bates attacked Ouilette, and he also attacked Frank Iyatunguk (the primary renter of the residence) and Alfred Braun (a friend of Iyatunguk's). Based on this incident, Bates was convicted of attempted murder for his attack on Ouilette. Bates was also convicted of third-degree assault for his attack on Iyatunguk and fourth-degree assault for his attack on Braun.

At Bates's trial, the prosecutor was allowed to introduce evidence of a prior assault that Bates committed against Ouilette, as well as evidence of prior assaults that Bates committed against a former girlfriend and her son. This evidence was admitted under the authority of Alaska Evidence Rule 404(b)(4); this rule states that when a defendant is tried for "a crime involving domestic violence", the government may offer evidence of the defendant's other crimes of domestic violence, whether against the same victim or against other persons.

Evidence Rule 404(b)(4) expressly incorporates the definition of "crime involving domestic violence" that is codified in AS 18.66.990. Under AS 18.66.990(3), the phrase "crime involving domestic violence" includes any crime against the person codified in chapter 41 of Title 11 of the Alaska Statutes (crimes such as attempted murder and assault in any degree) if the crime was committed "by [one] household member against another household member".

In this appeal, Bates argues that the definition of "household member" is unconstitutionally vague—and that, because Evidence Rule 404(b)(4) incorporates this definition, Evidence Rule 404(b)(4) is likewise unconstitutional.

As we explain in this opinion, we conclude that, under the facts of Bates's case, the definition of "household member" is not impermissibly vague. We therefore uphold the application of Evidence Rule 404(b)(4) in Bates's case.

Bates also challenges the trial judge's decision to allow the prosecutor to introduce the audio recording of a 911 call that was made from the Iyatunguk residence while Bates was there. The prosecutor argued that Bates could be heard speaking to the 911 dispatcher, and that Bates's words were evidence of his state of mind and his intentions when he attacked Ouilette and Iyatunguk. Bates opposed the admission of this evidence on the ground that the prosecution failed to offer any witness who would expressly identify the voice on the 911 recording as Bates's voice.

As we explain in this opinion, the law does not require the proponent of such evidence to produce a witness who can affirmatively identify the voice(s) heard in the recording. Rather, the identification of the voice(s) can rest on circumstantial evidence. In Bates's case, the circumstantial evidence was sufficient to support a reasonable inference that Bates was the man speaking to the 911 dispatcher. Accordingly, the trial judge could properly allow the prosecution to play the recording for the jury.

Finally, Bates challenges the sentencing judge's decision to make Bates ineligible for discretionary parole until he has served 20 years of his 33–year composite sentence.

Bates received 30 years to serve for the attempted murder, plus consecutive sentences of 2 years and 1 year to serve for the third- and fourth-degree assaults. He normally would be eligible to apply for discretionary parole after serving 10¾ years of this composite sentence. *See* AS 33.16.090(b)(1) and (b)(7).

We agree with Bates that the superior court failed to make sufficient findings to justify this restriction on Bates's parole eligibility. We therefore direct the superior court to reconsider this aspect of Bates's sentence.

*Why we conclude that the definition of "household member" is sufficiently definite to be constitutionally applied to the facts of Bates's case*

As we described earlier, the trial judge allowed the prosecutor to introduce evidence of a prior assault that Bates committed against Ouilette, as well as evidence of prior assaults that Bates committed against a former girlfriend and her son. This evidence was admitted under Alaska Evidence Rule 404(b)(4), which applies when a defendant is on trial for a "crime involving domestic violence". Under this rule, the government may offer evidence of the defendant's other crimes of domestic violence (whether against the same victim or against other persons).

Evidence Rule 404(b)(4) incorporates the definition of "crime involving domestic violence" that is codified in AS 18.66.990. Under AS 18.66.990(3), a "crime involving domestic violence" includes any assaultive crime codified in AS 11.41—crimes such as attempted murder and assault in any degree—if the crime was committed "by [one] household member against another household member".

As this Court noted in *Bingaman v. State,* 76 P.3d 398, 407 (Alaska App.2003), even though the phrase "domestic violence" is normally understood to mean an assault committed by one domestic partner against another, AS 18.66.990 defines the phrase "domestic violence" in a "special and wide-ranging way, quite divorced from its everyday meaning." One of the main reasons why Alaska's definition of "domestic violence" is so wide-ranging is that the legislature has defined the term "household member" in a broad, non-standard way.

When AS 18.66.990(3) speaks of "domestic violence" as a crime committed "by [one] household member against another", one might assume that this phrase refers to crimes in which the perpetrator and the victim share the same household. But AS 18.66.990(5) defines "household member" much more broadly:

(5) "household member" includes

(A) adults or minors who are current or former spouses;

(B) adults or minors who live together or who have lived together;

(C) adults or minors who are dating or who have dated;

(D) adults or minors who are engaged in or who have engaged in a sexual relationship;

(E) adults or minors who are related to each other up to the fourth degree of consanguinity, whether of the whole or half blood or by adoption, computed under the rules of civil law;

(F) adults or minors who are related or formerly related by marriage;

(G) persons who have a child of the relationship; and

(H) minor children of a person in a relationship that is described in (A)-(G) of this paragraph[.]

Now that we have described the pertinent statutory law, we will describe Bates's attack on the constitutionality of this law.

### (a) Bates's argument that the definitions of "dating" and "sexual relationship" are unconstitutionally vague

When the prosecutor at Bates's trial announced his intention to offer evidence of Bates's prior assaults under Evidence Rule 404(b)(4), Bates raised a constitutional challenge to Rule 404(b)(4). Bates acknowledged that, under the definitions of "domestic violence" and "household member" codified in AS 18.66.990, his assault on Jessie Ouilette might be construed as a crime of domestic violence for purposes of Evidence Rule 404(b)(4). But Bates argued that the definition of "household member" was impermissibly vague—so vague that the statute and the evidence rule were both unconstitutional.

The trial judge—Superior Court Judge Patrick J. McKay—held an evidentiary hearing to investigate the precise relationship between Bates and Ouilette. At this hearing, Ouilette testified that she met Bates in 2003, and that Bates was her "boyfriend". Ouilette stated that she started dating Bates in October 2003, and that she stopped dating him only after he assaulted her on February 26, 2007 (*i.e.*, after he committed the assault that was litigated in this case).

Ouilette further testified that she first had sex with Bates in October 2003, and that she continued to have sex with him until February 2007. During this period, Ouilette stated, she and Bates had sexual relations "[a] lot of times". With specific regard to the month of February 2007 (the month in which the assault took place), Ouilette stated that she and Bates had sex three times.

Ouilette's testimony was corroborated in part by the testimony of Anchorage Police Officer Justin Doll. Officer Doll testified that on June 3, 2004 he investigated a domestic violence incident between Bates and Ouilette. When Doll interviewed Bates, Bates told him that "he had been dating [Ouilette] off and on since February [of that year]." When Doll interviewed Ouilette, she confirmed that she and Bates "had been dating off and on for several months."

Based on this evidence, Judge McKay ruled that Bates's assault on Ouilette qualified as a "crime involving domestic violence" because Bates and Ouilette qualified as "household members" under clauses (C) and (D) of the statutory definition codified in AS 18.66.990(5). That is, Judge McKay concluded that Bates and Ouilette were dating or had dated, and that Bates and Ouilette had engaged in a sexual relationship.

On appeal, Bates argues that even if the testimony presented at the evidentiary hearing is true, Judge McKay committed error when he concluded that Bates and Ouilette had "dated", or that they had engaged in a "sexual relationship". Bates claims that these two clauses of the statutory definition are unconstitutionally vague because (according to Bates) the terms "dating" and "sexual relationship" have no clear, agreed-upon meaning.

Bates argues that, because these terms have no clear meaning, there is no ascertainable standard for determining whether two people's social interaction constitutes "dating" or constitutes a "sexual relationship". Consequently (under Bates's argument), there was no objective way for Judge McKay to assess whether Bates and Ouilette were "household members" as defined in clauses (C) or (D) of AS 18.66.990(5)—and, thus,

there was no objective way for Judge McKay to decide whether Bates was charged with a "crime involving domestic violence"—the key foundational fact that would allow evidence of Bates's prior assaults to be admitted under Evidence Rule 404(b)(4).

*(b) Why many of the legal principles pertaining to overly vague statutes do not have any relevance to Bates's case*

Before we reach the issue of whether the terms "dating" and "sexual relationship" have ascertainable meanings, we must first explain why many of the legal principles pertaining to overly vague statutes have no relevance to Bates's case.

Alaska cases generally declare that an overly vague statute poses three potential constitutional dangers. *See, e.g., Summers v. Anchorage*, 589 P.2d 863, 866–67 (Alaska 1979); *Bachlet v. State*, 941 P.2d 200, 203–04 (Alaska App.1997).

First, some overly vague statutes can be construed in a manner that unlawfully restricts the exercise of protected First Amendment rights. This danger is often referred to as "overbreadth"—although this same danger of overbreadth (*i.e.,* infringement of First Amendment rights) can be posed by a statute that is perfectly clear and unambiguous. As this Court explained in *Petersen v. State,*

Although courts often discuss overbreadth as an aspect of vagueness, these two concepts are distinct. "[A] statute may be invalid for being overbroad [even though its wording is] clear and precise if it prohibits constitutionally protected conduct." *Stock v. State,* 526 P.2d 3, 7 n. 7 (Alaska 1974) (citing *Grayned v. City of Rockford,* 408 U.S. 104, 114, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222, 231 (1972)).

930 P.2d 414, 425 (Alaska App.1996). Thus, in the context of impermissibly vague statutes, the danger lies in the fact that the meaning of the statute is so nebulous that it could *potentially* be construed in a manner that leads to overbreadth.

The second danger posed by an overly vague statute is that the statute may not give people fair notice of what conduct is regulated or prohibited. The constitutional guarantee of due process of law requires that statutes "be sufficiently explicit to inform those who are subject to [them] what conduct on their part will render them liable" to criminal penalties. *Marks v. Anchorage,* 500 P.2d 644, 650 (Alaska 1972) (quoting *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127–28, 70 L.Ed. 322 (1926)). When a statute either requires people to engage in particular conduct or forbids people from engaging in particular conduct, the statute must not be worded "in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application". *Ibid.*

The third danger is that an overly vague statute may give unrestrained or undue discretion to police officials and prosecutors—and, later, to judges and juries—when they determine whether a person's conduct falls within the statute (*i.e.,* whether the person's conduct constitutes a crime). As this Court explained in *Petersen,* 930 P.2d at 424, an impermissibly vague statute "[places] a power of arbitrary or discriminatory enforcement in the hands of police, prosecutors, and ultimately judges and juries".

Bates asserts that, due to the vagueness of the terms "dating" and "sexual relationship", the definition of "household member"—and, hence, the definition of "crime involving domestic violence"—presents all three of these dangers. But, in truth, the alleged vagueness that Bates complains of does not involve *any* of these dangers.

Bates was prosecuted for attempted murder, based on his assault on Ouilette. The definition of "crime involving domestic violence" plays no part in the definition of attempted murder.[1] In other words, Bates's guilt or innocence of attempted murder did not hinge on whether his offense constituted a "crime involving domestic violence". Nor does the prescribed punishment for attempt-

---

1. *See* AS 11.41.100(a) and AS 11.31.100(a).

ed murder differ according to whether the crime involves domestic violence.[2]

Rather, Bates's challenge to the definition of "household member" arises in the context of deciding whether Evidence Rule 404(b)(4) applied to Bates's case—whether this evidence rule authorized the State to introduce evidence of Bates's prior assaults on Ouilette and on another girlfriend.

In this context, any arguable vagueness in the definition of "dating" or "sexual relationship" has no potential bearing on Bates's exercise of First Amendment rights. Although Bates argues that his right of association is infringed by the lack of clarity in the definitions of "dating" and "sexual relationship", this argument has no merit.

Evidence Rule 404(b)(4) does not restrict or chill anyone's choice of boyfriends, girlfriends, or sexual partners. Evidence Rule 404(b)(4) merely states that if a person is prosecuted for assaulting or trying to kill a boyfriend, girlfriend, or sexual partner, and if the person has assaulted boyfriends, girlfriends, or sexual partners in the past, the trial judge can allow the government to introduce evidence of these prior assaults.

For similar reasons, the alleged lack of clarity in the definitions of "dating" and "sexual relationship" does not raise any problem regarding Bates's advance notice of the law. In the context of attacks on a statute for vagueness, the notion of "advance notice" does not refer to a person's ability to anticipate what evidence will be admissible at their trial in the event they are prosecuted for a crime. Rather, advance notice refers to a person's ability to understand what conduct the law requires or forbids (so that they can avoid criminal charges by conforming their conduct to the law).

As we have explained, Bates's guilt or innocence of assaulting and attempting to kill Ouilette did not hinge in any way on the definition of "domestic violence" or "crime involving domestic violence". Thus, the alleged vagueness of the terms "dating" or

"sexual relationship" had no bearing on Bates's ability to understand the definition of attempted murder and to refrain from doing what that statute forbids (attempting to kill another person).

For the same reason, the alleged lack of clarity in the terms "dating" or "sexual relationship" posed no danger of giving police officials, prosecutors, and juries the power to prosecute or convict Bates of attempted murder in an arbitrary or discriminatory way. The question of whether Bates's attempt to kill Ouilette constituted a "crime involving domestic violence" had no bearing on the elements of attempted murder, nor did it have any bearing on the jury's decision as to whether the State had proved those elements beyond a reasonable doubt.

### (c) The legal test that applies to Bates's case

Although Bates's case does not involve the three dangers discussed in the preceding section, Bates does have standing to complain of the alleged vagueness in the definitions of "dating" and "sexual relationship". But Bates's legal interest in this matter is merely the interest in having the trial judge apply the law of evidence rationally and even-handedly.

The Alaska Supreme Court has addressed this point of law in two cases: *Williams v. Alaska Department of Revenue*, 895 P.2d 99 (Alaska 1995), and *R.R. v. State*, 919 P.2d 754 (Alaska 1996).

*Williams* involved a woman who filed a claim for worker's compensation based on stress-related mental injuries. The Workers' Compensation Board denied her claim, and she then appealed to the supreme court.[3] One of Williams's main contentions on appeal was that the statutory definition of "injury" (for purposes of workers' compensation claims) was unconstitutionally vague.

The supreme court noted that Williams's claim of vagueness did not present any of the three dangers normally associated with over-

---

**2.** *See* AS 12.55.125(b). *But see* AS 12.55.015(f), which declares that a sentencing court must order the forfeiture "of a deadly weapon that was in the actual possession of or used by the defen-

dant during the commission of a crime involving domestic violence".

**3.** *Williams*, 895 P.2d at 99.

ly vague statutes: the chilling of First Amendment rights, the failure to give notice of prohibited conduct, or the potential for arbitrary or discriminatory enforcement.[4] The court then stated, "Assuming that there is a constitutional [claim] of statutory vagueness in a case such as this, ... [a]ll that should be required is legislative language which is not so conflicting and confused that it cannot be given meaning in the adjudication process."[5]

The second case, *R.R. v. State*, involved a child-in-need-of-aid proceeding. The appeal was brought by the mother of four children after the superior court removed the children from her custody.[6] One of the mother's arguments on appeal was that there was an unconstitutional vagueness in AS 13.26.045, the statute that grants the superior court the authority to appoint a guardian for an unmarried minor if all rights of custody possessed by the minor's parents have been suspended or terminated.[7]

Again, as in *Williams*, the supreme court noted that the mother's challenge to the statute did not involve the three dangers normally associated with overly vague statutes. And because of this, the supreme court explained, the mother had only one potential constitutional ground for attacking the alleged vagueness of the statute: the claim that the statutory language was "so conflicting and confused that it cannot be given meaning in the adjudication process."[8]

The court rule at issue in Bates's case—Alaska Evidence Rule 404(b)(4)—is analogous to the statutes at issue in *Williams* and *R.R.*. Evidence Rule 404(b)(4) does not restrict First Amendment rights; it prohibits no conduct; and it does not authorize either criminal prosecutions or civil enforcement actions where a person might lose an important right based on proof that the person's conduct did not meet a certain standard. Thus, at best, Bates's case is governed by the same limited vagueness test that the Alaska Supreme Court applied in *Williams* and *R.R.*.

We say "at best" because there is a potential distinction between Bates's case and the litigation in *Williams* and *R.R.*. The question presented in both *Williams* and *R.R.* was the potential vagueness of the standard that governed the granting or denial of relief. In contrast, the evidence rule that Bates challenges in the present appeal does not govern whether one side or the other is entitled to relief, but rather only the type of evidence that can be introduced at trial. Arguably, then, Bates's interest in challenging the vagueness of Evidence Rule 404(b)(4) is of even less weight than the interests of the litigants in *Williams* and *R.R.*.

But even if Bates's case is governed by the same vagueness test that the Alaska Supreme Court applied in *Williams* and *R.R.*, Bates has failed to show that Evidence Rule 404(b)(4) suffers from unconstitutional vagueness. For the reasons we are about to explain, we conclude that the legislature's use of the terms "dating" and "sexual relationship" in the definition of "household member"—and, by reference, in the definition of "crime involving domestic violence"—does not result in a definition "so conflicting [or] confused that it cannot be given meaning in the adjudication process."[9]

### (d) *Application of this test to the facts of Bates's case*

■ As we explained in the preceding section of this opinion, the question confronting us is whether the terms "dating" and "sexual relationship" have a sufficiently · certain meaning that they provide an ascertainable standard for trial judges to use when the judges are asked to decide whether Evidence Rule 404(b)(4) applies to a defendant's case—that is, when judges are asked to decide whether the defendant is on trial for a "crime involving domestic violence".

■ Although the law requires an ascertainable standard, the law does not require a

---

4. *Id.*, 895 P.2d at 105.

5. *Ibid.*

6. *R.R.*, 919 P.2d at 755.

7. *Id.* at 758.

8. *Ibid.* (quoting *Williams*, 895 P.2d at 105).

9. *Williams*, 895 P.2d at 105.

standard that eliminates all ambiguity or doubt. For instance, in *Williams,* our supreme court had to decide whether the phrase "extraordinary and unusual ... pressures and tensions" was sufficiently definite to survive a vagueness challenge. The court declared that this phrase "readily satisfies [the] test". 895 P.2d at 105.

The supreme court noted that "[this] language is no more general than numerous other terms which have survived void for vagueness challenges." *Ibid.,* citing *Coghill v. Coghill,* 836 P.2d 921, 929 (Alaska 1992) (upholding "good cause" and "manifest injustice"); *Storrs v. State Medical Board,* 664 P.2d 547, 549–50 (Alaska 1983) (upholding "professional incompetence"); *R.C. v. Department of Health and Social Services,* 760 P.2d 501, 506 (Alaska 1988) (reviewing appellate decisions which rejected vagueness challenges to standards such as "unfit", "improper", "neglected", "basic, essential, and necessary needs", and "reasonable parental care").

The supreme court also noted that the legislature, when drafting this statute, had to "address the subject broadly[,] because every employee's condition is different". *Id.* at 106. The court concluded that the statute was sufficiently clear because its wording "provides specific information on how to determine whether a stress[-]related mental injury is in fact compensable under the [Workers' Compensation] Act." *Ibid.* The court conceded that "there [would] always be borderline and difficult cases", but the court noted that borderline and difficult cases "are a [given] whenever a general standard is applied." *Ibid.*

*See also Haggblom v. City of Dillingham,* 191 P.3d 991, 997–99 (Alaska 2008) (rejecting a vagueness challenge to the phrase "without provocation"), and *Panther v. State,* 780 P.2d 386, 390–91 (Alaska App.1989) (rejecting the contention that there is no objectively ascertainable distinction between a "deviation" from the applicable standard of care and a "gross deviation" from the same standard of care).

Returning to the vagueness claim that Bates raises in this appeal, we conclude that the phrase "sexual relationship" is sufficiently definite to survive Bates's vagueness challenge.

In the entry for the adjective "sexual" in *Webster's New World College Dictionary* (Fourth Edition, 2004), the pertinent definition is "characteristic of, or involving sex ... or the instincts, drives, behavior, etc., associated with sex". *Id.* at p. 1314. And in the entry for the noun "relationship", the pertinent definition is "a continuing attachment or association between persons, firms, etc., specif[ically], one between lovers". *Id.* at p. 1209.

(The pertinent definition of the noun "lover" is "a person who loves sexually or romantically; specif[ically], *a* ) either partner in a sexual relationship of any kind, [or] *b* ) either partner in an adulterous or otherwise illicit sexual relationship". *Id.* at p. 851.)

These definitions provide an ascertainable standard for determining whether two people are in a sexual relationship.

It is true, as the supreme court noted in *Williams,* that there will inevitably be borderline or difficult cases—cases where the facts do not clearly disclose whether the attachment or association between the two people is a "continuing" one, or (alternatively) where the facts do not clearly disclose whether the continuing attachment or association between the two people involves sex or the "instincts, drives, [or] behavior ... associated with sex". But these difficulties are not present in Bates's case.

As we explained earlier in this opinion, Judge McKay held an evidentiary hearing to investigate the precise relationship between Bates and Ouilette. At this hearing, Ouilette testified that she met Bates in 2003, and that Bates was her "boyfriend". Ouilette stated that she started dating Bates in October 2003, and that she stopped dating him only after he assaulted her on February 26, 2007 (*i.e.,* after he committed the assault that was litigated in this case).

Ouilette further testified that she first had sex with Bates in October 2003, and that she continued to have sex with him until February 2007. During this period, Ouilette stated, she and Bates had sexual relations "[a]

lot of times". With specific regard to the month of February 2007 (the month in which the assault took place), Ouilette stated that she and Bates had sex three times.

This testimony amply supports Judge McKay's conclusion that Bates and Ouilette were participants in a "sexual relationship".

We turn now to the more difficult question of whether the term "dating" has a meaningful definition.

■■■ In *Webster's New World College Dictionary*, the entry for the verb "date" contains only one pertinent definition: "to have social engagements with persons of the opposite sex". *Id.* at p. 368. But this definition is plainly inaccurate, or at least misleading. For example, this definition falsely suggests that "dating" includes the act of meeting one's relative or one's business associate for lunch, if the relative or business associate is of the opposite sex. In addition, this definition falsely suggests that "dating" can occur only in a heterosexual relationship.

In this country, when we say that two people are "dating", this phrase connotes an ongoing series of social engagements, usually characterized by the parties' interest, or at least their potential interest, in pursuing a romantic relationship. Here, for instance, is the Wikipedia entry for "dating":

> Dating is a form of human courtship consisting of social activities done by two persons with the aim of each assessing the other's suitability as a partner in an intimate relationship or as a spouse. While the term has several senses, it usually refers to the act of meeting and engaging in some mutually agreed upon social activity in public, together, as a couple. The protocols and practices of dating, and the terms used to describe it, vary considerably from country to country. The most common [meaning] is two people trying out a relationship and exploring whether they're compatible by *going out together* in public as a couple[. They] may or may not yet be having sexual relations, and this period of courtship is sometimes seen as a precursor to engagement or marriage.

http://en.wikipedia.org/wiki/Dating (May 10, 2011) (emphasis in the original).

See also this entry of September 24, 2007 entitled "The Definition of Dating", from Bonny Albo's *Bonny's Dating Blog:*

> [A] date refers to an activity two people share together with the intention of getting to know each other better on a potentially romantic level. This differs greatly from "hooking up" [, a term] which usually describes a casual get[-]together between two people that may or may not be sexual in nature. Two people who are "dating" ... have shared several dates together and have made it clear to one another they are interested in more than just a friendship—even if so far the exchanges have been purely friendly in nature. Dating is, essentially, getting to know someone over an extended period of time to determine if a relationship is something worth pursuing.

http://dating.about.com/b/2007/09/24/the-definition-of-dating.htm.

We acknowledge that these two sources (a Wikipedia entry and a blog entry) are not the type that courts traditionally rely on to determine the meaning of a word or phrase. In the present case, however, the dictionary has failed us. Moreover, as Bates strenuously notes in his brief, people can have quite different views as to what the word "dating" means—in large part, because the meaning of this word has been shifting in the past decades as our society has experienced changes in the relations between the sexes and the role of marriage as an institution.

In these circumstances, one could plausibly argue that Wikipedia offers one of the most accurate gauges of what the word "dating" now means in contemporary culture. The articles in Wikipedia are open to editing by essentially anyone with Internet access. This process of public input means that Wikipedia articles are subject to a type of "social Darwinism". To quote the Wikipedia article on the characteristics of a "wiki" website:

> [B]ecause of the openness and rapidity [with which] wiki pages can be edited, the pages undergo a natural selection process like that which nature [imposes on] living organisms. "Unfit" sentences and sections are ruthlessly culled, edited[,] and replaced

if they are not considered "fit" [by the public], which hopefully results in the evolution of ... higher quality and more relevant [content]. Whilst such openness may invite "vandalism" and the posting of untrue information, this same openness also makes it possible to rapidly correct or restore [the] quality [of the] wiki page. http://en.wikipedia.org/wiki/Wiki, "Characteristics" (May 10, 2011).

Turning now to more traditional legal authorities, we note that several state legislatures have likewise defined "dating" as a continuing relationship (rather than a single social engagement or isolated outings) whose object (or at least potential object) is long-term intimacy or marriage.

California law defines "dating relationships" as "frequent, intimate associations primarily characterized by the expectation of affection or sexual involvement independent of financial considerations." California Family Code, § 6210, and California Penal Code, § 243(f)(10). In a similar vein, Texas Family Code § 71.0021(b) defines a "dating relationship" as a continuous relationship of a "romantic" or "intimate" nature. The Texas statute further provides that the existence of a dating relationship is to be determined by considering the length and nature of the relationship, and the frequency and type of the couple's interactions. *See Ochoa v. State*, —— S.W.3d ——, —— (Tex.App.2010). Washington law defines "dating relationship" as "a social relationship of a romantic nature"; Washington Statutes § 26.50.010(3). Like the Texas statute, the Washington statute provides that the existence of a dating relationship is to be determined by considering various factors: the length and nature of the relationship, as well as the frequency of the couple's interactions. *See also* Massachusetts Statutes, chapter 209A, § 1.

We acknowledge that the Alaska statute— AS 18.66.990(5)(C)—uses the term "dating" rather than "dating relationship". We further acknowledge that this statute speaks in terms of persons "who are dating or who have dated". The latter portion of this phrase, "or who have dated", could conceivably be interpreted to include persons who have gone on a single date in the past.

Nevertheless, we conclude that, at least in the context of defining "domestic violence", it makes the most sense to interpret the term "dating" as referring to a relationship—that is, a continuing attachment or association— rather than isolated shared social engagements.

 As the Supreme Court of Kentucky noted in *Barnett v. Wiley*, 103 S.W.3d 17, 19 (Ky.2003), the purpose of domestic violence legislation

is to protect victims from harm caused by ... persons whose intimate ... relationship to the victim increases the danger of harm, either because the parties live in physical proximity or because the relationship is one whose intimacy may disable the victim from seeking protection.

*See also State v. Ankeny*, 358 Mont. 32, 243 P.3d 391, 397 (2010) (quoting this passage).

This view, that "domestic violence" is violence that arises in the context of a relationship, was echoed by the Colorado Supreme Court last year in *People v. Disher*, 224 P.3d 254, 258 (Colo.2010): "[T]he hallmark of domestic violence [is an] action that is used to coerce, control, punish, intimidate, or exact revenge within the context of an intimate relationship."

Because the focus of domestic violence legislation is the violence that takes place within the context of a relationship, we conclude that the term "dating" should be interpreted in the sense indicated by the authorities (both legal and non-legal) that we have reviewed here: a relationship that either is marked by emotional intimacy or whose purpose is to allow two people to evaluate each other's suitability as a partner in an intimate relationship or in marriage. We believe that this interpretation most closely reflects the legislature's intention when it enacted our domestic violence legislation.

There will inevitably be borderline or difficult cases—situations where it is unclear whether a couple's interactions meet this definition. But this does not mean that the definition is fatally vague. We discussed this point of law in *Panther v. State*, 780 P.2d 386 (Alaska App.1989)—the case where we were

asked to decide whether there was an objectively ascertainable distinction between a "deviation" and a "gross deviation" from the standard of care that reasonable people would observe under the circumstances.

In *Panther*, we acknowledged that

[t]he distinction between a "deviation," on the one hand, and a "gross deviation," on the other, undeniably involves a normative component. Yet, this imprecision is unavoidable and falls well within traditionally accepted limits.

. . .

The fact that the standard does not provide a bright-line test for determining when a risk is so substantial and unjustifiable that failure to observe it should be punished does not mean that the standard is unconstitutionally vague. Although difficult to define concretely, the statutory requirement of a "gross deviation" from the standard of care that a reasonable person would observe is readily comprehensible.

780 P.2d at 390–91. *See also Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127–28, 70 L.Ed. 322 (1926) (declaring that statutory definitions can withstand a vagueness challenge "notwithstanding an element of degree in the definition as to which estimates might differ").

Moreover, Bates's case is not a borderline case. As we have already described, Ouilette testified at the evidentiary hearing about the details of her relationship with Bates. Her testimony amply supports Judge McKay's conclusion that Bates and Ouilette were "dating" when Bates committed the assault in this case.

Under the facts of this case, and under the definitions of "sexual relationship" and "dating" that we have described in this opinion, Judge McKay correctly ruled that Bates and Ouilette were "household members" as that phrase is defined in AS 18.66.990(5), and thus Bates's assault on Ouilette qualified as a "crime involving domestic violence" for purposes of Evidence Rule 404(b)(4)—*i.e.*, under the definition of "domestic violence" codified in AS 18.66.990(3).

*Why we conclude that the State presented a sufficient evidentiary foundation for the audio recording of the 911 call*

At Bates's trial, Judge McKay allowed the prosecutor to introduce the audio recording of a 911 call that was made from the Iyatunguk residence while Bates was there. The prosecutor argued that, during a portion of this recording, Bates could be heard speaking to the 911 dispatcher, and that Bates's statements to the 911 dispatcher were relevant to show his state of mind—in particular, his intentions when he attacked Ouilette and Iyatunguk.

(There were actually two 911 calls placed from Iyatunguk's residence. The first call was made by Iyatunguk, and that call is not at issue here. The controversy pertains to the second 911 call. This second call was initiated by Iyatunguk's friend, Alfred Braun, but then a second man—allegedly Bates— began speaking to the dispatcher.)

The evidence pertaining to the second 911 call was sufficient to establish that the second man who spoke was neither Iyatunguk nor Braun. The 911 dispatcher testified that Iyatunguk identified himself during the first call—thus allowing the inference that the dispatcher would have recognized Iyatunguk's voice if he had spoken to her again during the second 911 call. The dispatcher further testified that Braun identified himself during the initial portion of the second 911 call, and that the other man who spoke to her during the latter portion of this second call was *not* Iyatunguk.

Nevertheless, Bates opposed the admission of the audio recording on the ground that the prosecution failed to offer any witness to expressly identify the second voice on the 911 recording as Bates's voice.

Judge McKay ruled that the State could play the audio recording for the jury, but he prohibited the State from eliciting the 911 dispatcher's opinion that the man who spoke to her during the latter half of the second call was Bates. The State then played the recording for the jury.

The recording begins with Alfred Braun identifying himself and asking for police assistance because Bates and Iyatunguk were

fighting. The 911 dispatcher can be heard obtaining information from Braun, and counseling him to get away from Bates.

Braun then told the 911 dispatcher that he was going to try to separate Bates and Iyatunguk. To do this, Braun put the phone down (without hanging up).

Shortly after Braun set the phone down, a different male voice came on the line. When the 911 dispatcher asked this man to identify himself, the man responded, "It doesn't matter." The man repeatedly refused to identify himself, telling the dispatcher that his name "[didn't] matter", or that his name was "Nobody".

Shortly after this second man got on the line, he told the 911 dispatcher, "You are gonna put a bullet in my head". The man can also be heard shouting to other people in the apartment, "Anyone else wanna play with me, bitches?"

The unidentified man then put the phone down, and the 911 recording picked up a new sound—apparently, the sound of someone being hit or kicked. A woman can be heard screaming and moaning—presumably Ouilette, since she was the only woman at the residence. After this, the unidentified man came back on the line (and again refused to identify himself). When the 911 dispatcher asked him, "What's going on there?", the man responded, "You already know what's going on." Finally, the man told the dispatcher that he was "hanging up now". The man added, "I'm bleeding severely . . . bleeding severely. And I'm ready." Shortly after that, the line went dead.

In his brief to this Court, Bates notes that the State did not ask Iyatunguk or Braun or any other person present at the residence to identify Bates as the person speaking to the dispatcher during the latter portion of the 911 call. Bates argues that, without this type of evidentiary foundation, the recording was inadmissible because there was no showing that the recording was relevant. (See Alaska Evidence Rule 402, which declares that evidence is not admissible unless it is relevant.)

The State argues that there was no need for the prosecutor to offer evidence that the man speaking to the 911 dispatcher was Bates. The State relies on this Court's decision in *Thompson v. State*, 210 P.3d 1233, 1238–39 (Alaska App.2009), where we stated that "the modern test for authentication [of an audio recording] is whether the proponent of the evidence has presented sufficient evidence to support a rational finding that the . . . recording is authentic". Based on this passage from *Thompson*, the State contends that once the prosecutor offered sufficient evidence to support a finding that the recording was an accurate rendition of the 911 dispatcher's conversation with the people in the residence, the recording was admissible even without proof that Bates was one of the men who spoke to the dispatcher.

This may be true as far as it goes. But as we have explained, the trial prosecutor argued to the jury that it was *Bates* who made the statements to the dispatcher during the second portion of the tape—and that these statements demonstrated Bates's state of mind. To support this assertion, the prosecutor needed to prove something more than simply the fact that a conversation occurred between some man and the 911 dispatcher, and that this conversation was accurately rendered in the recording. The prosecutor also had to prove that the man speaking those words was Bates.

(This issue did not arise in *Thompson* because, in that case, there was no dispute concerning the identity of the participants in the recorded conversations. The defendant's challenge to the recording was that it might not accurately reflect the *content* of the conversations.)

The rule that governs situations like this is Evidence Rule 104(b):

*Relevancy Conditioned on Fact.* When the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit [the evidence] upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

As explained in the Commentary to Rule 104(b), there are times when a piece of evidence is relevant only if a particular underlying fact is true:

[W]hen a spoken statement is relied upon to prove [that a person had] notice [of something], [the statement] is without probative value unless [the person] heard it. Or if a letter purporting to be from [a particular person] is relied upon to establish an admission [against interest by that person], [the letter] has no probative value unless [the person] wrote or authorized it.

■ This type of relevance is called "conditional relevance", and Evidence Rule 104(b) prescribes the rule for situations where the parties dispute the underlying fact which, if true, makes the evidence relevant. Under Rule 104(b), the trial judge should allow a party to offer the conditionally relevant evidence if there is—or if, according to the party's offer of proof, there will be—sufficient evidence to justify a reasonable conclusion that the disputed underlying fact should be resolved in the offering party's favor.

Thus, in the examples given in the Commentary, the trial judge should admit evidence of the spoken statement if there is sufficient evidence to justify a reasonable conclusion that the person in question heard the statement. Similarly, the trial judge should admit evidence of the content of the letter if there is sufficient evidence to justify a reasonable conclusion that the person in question wrote or authorized the letter.

■ It is up to the trier of fact (the jury or, in bench trials, the judge) to determine, during final deliberations, whether the asserted underlying fact is true. If the trier of fact finds that the underlying fact is true, then the evidence will be relevant, and the trier of fact can rely on the evidence in reaching the verdict.

If, on the other hand, the trier of fact finds that the underlying fact is not true, then the trier of fact will naturally disregard the evidence—because the irrelevance of the evidence will be obvious. For instance, in the examples described in the Commentary, if the trier of fact finds that the person in question did not hear the spoken statement, then of course the trier of fact will conclude that the statement is irrelevant for purposes of deciding whether the person was on notice of the things mentioned in that statement.

Similarly, if the trier of fact finds that the person in question did not write or authorize the letter, then the trier of fact will conclude that the things written in the letter do not constitute admissions of the person in question.

We applied this principle in *Bennett v. Anchorage*, 205 P.3d 1113, 1117 (Alaska App. 2009), a case where the relevance of a prior act of domestic violence hinged on resolution of a factual dispute concerning the nature of the prior act, and in *James v. State*, 671 P.2d 885, 892–93 (Alaska App.1983), a case where there was a dispute as to the identity of the person who telephoned the local police dispatcher and asked the police to "get [the victim] out [of here] before I kill him". We also applied this principle in *Ayagarak v. State*, Alaska App. Memorandum Opinion No. 4695 (April 23, 2003), 2003 WL 1922623, *5, where there was a dispute as to whether a prior bad act was committed by the defendant or by someone else.

This same principle governs the dispute in Bates's case. The prosecutor offered evidence of the statements made to the 911 dispatcher under the theory that it was Bates who made those statements. Under Evidence Rule 104(b), the State could properly introduce this evidence *if* there was sufficient evidence to support a reasonable conclusion that it was, in fact, Bates who made the statements.

It is true, as Bates points out, that the prosecutor did not present any witness who directly identified the voice in the recording as Bates's voice. But this underlying fact could be proved by circumstantial evidence.

In this case, there were five men in the residence at the time the 911 call was made: Iyatunguk, Braun, Bates, and two brothers whose last name was Nikolai. Iyatunguk's voice and Braun's voice had already been identified (Iyatunguk's in the first 911 call, and Braun's in the initial portion of the second 911 call). Thus, the man speaking to the 911 dispatcher during the latter portion of the second 911 call could only be Bates or one of the Nikolai brothers.

The man who was speaking claimed that he was bleeding. Of the three potential

speakers (Bates and the Nikolai brothers), Bates was the only one who was bleeding, and the only one who was conscious. (The evidence showed that the Nikolai brothers had passed out from drinking, and they were not bleeding.)

These facts provided sufficient circumstantial evidence to support a reasonable conclusion that Bates was the one speaking to the 911 dispatcher during the latter portion of the 911 call. Consequently, the recording of the 911 call—offered as evidence of Bates's statements—was admissible under Evidence Rule 104(b).

### Judge McKay's decision to restrict Bates's parole eligibility

Judge McKay sentenced Bates to serve 30 years for the crime of attempting to murder Ouilette, and the judge imposed consecutive sentences of 2 years and 1 year to serve for Bates's assaults on Iyatunguk and Braun. Under the rules governing parole eligibility codified in AS 33.16.090, Bates would normally be eligible to apply for discretionary parole after serving 10¾ years of this composite 33–year sentence. *See* AS 33.16.090(b)(1) and (b)(7). However, Judge McKay exercised his authority under AS 12.55.115 and declared that Bates would not be eligible to apply for discretionary parole until he served 20 years of the composite sentence.

Under Alaska law, a sentencing judge who decides to restrict a defendant's eligibility for parole must "specifically address the issue of parole restriction" and must "[explain] with particularity [the] reasons for concluding that the [normal] parole eligibility prescribed by AS 33.16.090 and AS 33.16.100(c)-(d) is insufficient to protect the public and [ensure] the defendant's reformation." *Hinson v. State,* 199 P.3d 1166, 1173 (Alaska App.2008), quoting *Stern v. State,* 827 P.2d 442, 450 (Alaska App.1992).

In its brief to this Court, the State acknowledges that even though Judge McKay "made various direct and indirect statements" regarding his decision to restrict Bates's parole eligibility, the judge's statements "arguably" do not satisfy the requirements of *Hinson* and *Stern.*

We have examined the sentencing record, and we agree that Judge McKay's sentencing remarks do not adequately explain the parole restriction as required by *Hinson* and *Stern.* Accordingly, we direct the superior court to reconsider this aspect of Bates's sentence.

### Conclusion

With the exception of the restriction on Bates's parole eligibility, the judgement of the superior court is AFFIRMED.

We REMAND Bates's case to the superior court so that the superior court can reconsider whether Bates's eligibility for parole should be restricted under AS 12.55.115. If, on reconsideration, the superior court concludes that Bates's eligibility to apply for parole should not be restricted, the superior court should modify the judgement to reflect this, and the superior court should notify this Court of its decision. We will then close this appeal.

If, on the other hand, the superior court again concludes that Bates's parole eligibility should be restricted, the superior court should issue supplemental findings to support that decision, and the superior court should forward a copy of those findings to this Court. In that event, the parties shall have 30 days to file simultaneous memoranda addressing the superior court's findings and discussing whether those findings justify the restriction on Bates's parole eligibility. After this Court receives the parties' memoranda, we will resume our consideration of the parole restriction issue.